OPINION OF THE COURT
Martin Marcus, J.
The defendant in this case is a New York State Assemblyman and the chairman of the Executive Committee of the Kings County Democratic Party (KCDC). According to the evidence before the grand jury, as an Assemblyman he routinely traveled from Brooklyn to Albany and back on New York State Assembly business. At the same time, as chairman of the KCDC, he was provided with a car and a credit card by which the KCDC paid all of his car-related expenses, including gas, oil and routine maintenance. During the period of time covered by the above-captioned indictment, the defendant submitted vouchers by which he sought and received a mileage allowance for the miles he had driven to and from Albany. It is the theory of the prosecution that by receiving the mileage allowances sought in the vouchers, the defendant stole money from the State of New York by falsely claiming to have incurred the expenses which the allowances were meant to reimburse, and that when he certified on the vouchers that he incurred those expenses and was due a balance that included the mileage allowances, the certification on each voucher constituted a false statement.
Based on this evidence, and pursuant to this theory, the defendant was indicted by the grand jury of Kings County and charged with one count of grand larceny in the third degree (Penal Law § 155.35) and 76 counts of offering a false instrument for filing in the first degree (Penal Law § 175.35). The grand larceny count alleges that between May 27, 1999 and November 29, 2002, pursuant to a common scheme and plan, the defendant stole more than $3,000 from the State of New York by “s[eeking] and obtaining] reimbursement for travel expenses that the defendant claimed to have incurred in Kings County and other counties by means of false pretenses in written instruments that the defendant offered for filing.” The 76 false filing counts concern those written instruments, 76 travel vouchers (formally called NYS Assembly Member Per Diem Expenses Reimbursement Vouchers), which the counts allege the *321 defendant offered for filing with the intent to defraud the State, knowing that each contained “a false statement and false information concerning travel expenses that the defendant purported to incur in Kings and other counties.”
In an omnibus motion, the defendant seeks inspection of the grand jury minutes and dismissal or reduction of the charges in the indictment, claiming that the evidence before the grand jury was legally insufficient and that the grand jury proceedings were defective. The defendant also claims that the indictment itself is defective and that there are jurisdictional and legal impediments to his conviction for the crimes charged. The defendant also moves to dismiss the indictment in the interests of justice. Finally, the defendant moves for an order directing the People to provide him with a bill of particulars pursuant to CPL 200.95, and for discovery and inspection under CPL 240.40. Upon consideration of the papers submitted by both the defendant and the People, and after hearing oral argument from both parties, the court issues the following decision.
The defendant’s motion for the court to inspect the grand jury minutes is granted; the court has inspected and reviewed the grand jury minutes. The defendant’s motion for disclosure of the grand jury minutes to him has previously been granted to the extent that, with minor redactions, the testimony of two witnesses, William Collins and Linda Stewart, has been provided to him. The motion to disclose the remainder of the grand jury minutes is denied since that disclosure is unnecessary for the resolution of the defendant’s motions.
The Grand Jury Evidence
The following is a summary of the evidence before the grand jury. During the time period set forth in the indictment, the KCDC provided the defendant, as chairman, with a series of Lincoln Town Cars for use “at his discretion.” Although each car was registered to him,[1] and his Assembly license plates were attached to the car, it was leased by and the lease payments *322 were made by the KCDC. The defendant charged all expenses for the car, including gas, maintenance and repairs, to the KC-DC’s corporate account with American Express, using a credit card for which he was the designated cardholder, and which, according to testimony before the grand jury, the KCDC provided to him for paying expenses “reasonably related to the business of the Kings County Democratic Committee.” The American Express account statement was sent to “Clarence Norman Jr, King Co Dem Com,” at an address in Brooklyn which appears to have been the defendant’s home.
The KCDC paid all the bills received from American Express for the charges to the credit card account, including the expenses charged by the defendant for the gas, maintenance and repair of each of the Lincoln Town Cars he used during the time period set forth in the indictment. As chairman of the KCDC, the defendant was the only person who could authorize payment of its bills, and the treasurer of the KCDC signed checks for the approved payments only if a bill was submitted with the chairman’s treasurer voucher, requesting payment. During the time period covered by the indictment, the defendant made 96 purchases of gasoline that he charged to the American Express card, as well as other charges for the maintenance and repair of the car. All of those charges were included in the American Express bills for the KCDC account, and all of the bills that included these charges were paid by the KCDC to American Express at the defendant’s direction.
Over the same period of time, the defendant submitted 76 pairs of “Quick Pay Vouchers” and “NYS Assembly Member Per Diem Expenses Reimbursement Vouchers” to the New York State Assembly Finance Officer in order to obtain compensation for his lodging, meals, transportation and tolls while he was away from his home or his district office in Kings County on Assembly business. The Finance Officer, in turn, submitted them to the New York State Comptroller’s Office. Each pair of documents sought, in addition to reimbursement for tolls and a per diem allowance covering lodging and meals, a fixed number of cents per mile for using a “personal vehicle” in traveling 320 miles round trip between Brooklyn and Albany.[2] The mileage allowance sought through these vouchers constituted reimbursement for “wear and tear” to the car resulting from the travel *323 between Brooklyn and Albany, and for the cost of gasoline, tires, oil and maintenance.[3]
Each of the NYS Assembly Member Per Diem Expenses Reimbursement Vouchers included a preprinted certification that stated:
“I hereby certify that the above expenses were incurred in the rendering of legislative duties and that the above bill is just, true and correct and that the balance shown is actually due and owing, and that taxes from which the State is exempt are excluded therefrom and this voucher is submitted in accordance with Rules promulgated by the Speaker of the Assembly.”
On each such voucher, the defendant signed his name directly below the certification. In response to each of the 76 pairs of vouchers the defendant submitted, the Comptroller’s Office issued him a check, written on the account of the Division of the Treasury of the State of New York Department of Taxation and Finance, for the full amount requested. The total amount the State paid to the defendant as reimbursement for the use of his “personal vehicle” on the round trips he made between Brooklyn and Albany during the 3½-year period set forth in the indictment totaled more than $5,500.
The grand jury also received information concerning the statutory basis for reimbursement of New York State legislators. Specifically, they learned that Legislative Law § 5 (2) provides that “[e]ach member of the Legislature shall receive payment of actual and necessary transportation expenses . . . while in travel status in the performance of his or her duties . . . .”[4] In addition, William Collins, Counsel to the New York State Assembly Majority, testified that if a Member of the Assembly received payment for travel expenses from another source, and did not pay the expenses himself, he would not have incurred those expenses or be entitled to reimbursement for them. More specifically, Mr. Collins testified that if a Member of the Assembly did not have to pay for a personal vehicle or pay *324 the expenses of operating such a vehicle, reimbursing the Member for those expenses would not be consistent with Legislative Law § 5 (2) or the governing regulations.[5] Finally, Linda Stewart, Chief Auditor of State Expenditures for the New York State Comptroller’s Office, testified that the defendant did not have the right to receive reimbursement for expenses for which he did not himself pay.
The Sufficiency of the Grand Jury Evidence
The evidence presented to the grand jury was sufficient to support the charges contained in the indictment, and the defendant’s motion to dismiss the indictment, or, in the alternative, to reduce the charges on this ground is denied. “ ‘[L]egally sufficient evidence’ means competent evidence which, if accepted as true, would establish every element of the crime charged and the defendant’s commission of it.” (People v Martini, 79 NY2d 561, 568 [1992]; People v Haney, 30 NY2d 328, 335-336 [1972]; CPL 70.10 [1].) In determining whether grand jury evidence is legally sufficient, the court must determine “whether the evidence, viewed in the light most favorable to the People, if unexplained and uncontradicted, would be sufficient to warrant conviction by a trial jury.” (People v Manini, 79 NY2d at 568-569, citing People v Jennings, 69 NY2d 103, 114-115 [1986]; People v Pelchat, 62 NY2d 97, 105 [1984].) Even when assessing the sufficiency of the evidence in a case in which it is entirely circumstantial, the court’s “inquiry is limited to ‘whether the facts, if proven, and the inferences that logically flow from those facts supply proof of every element of the charged crimes.’ ” (People v Hyde, 302 AD2d 101, 104 [2003], quoting People v Deegan, 69 NY2d 976, 979 [1987].) The fact that “innocent inferences could possibly be drawn ... is irrelevant,” as long as the grand jury could rationally draw the inference of guilt. (Id.)
Based on the evidence described above, the grand jury could find that by submitting the vouchers, the defendant knowingly, and with intent to defraud, sought and received payment *325 for mileage allowances for driving expenses that he did not actually incur, and thus stole money from the State of New York. The grand larceny count properly aggregates the amount of money the defendant obtained from the vouchers submitted between May 27, 1999 and November 29, 2002, on the theory, specifically alleged in the indictment, that the larceny occurred pursuant to a “common scheme and plan.” Such aggregation is permissible even though “the successive takings extended over a long period of time” (People v Rosich, 170 AD2d 703, 703 [2d Dept 1991]; see also People v Tighe, 2 AD3d 1364, 1365 [4th Dept 2003] [“the People may in a single count of larceny aggregate amounts allegedly stolen by defendant from a single victim pursuant to a single intent and one general fraudulent plan, even one carried out in successive stages over a period of time” (citations and internal quotation marks omitted)], quoting People v Rossi, 5 NY2d 396, 400-401 [1959]).
The defendant claims that the evidence fails to establish that a larceny was committed in the manner specifically alleged in the first count. An indictment need not specify that a defendant committed a larceny in any particular manner, unless the theory of prosecution is that the larceny was from a person or was committed by extortion (Penal Law § 155.45 [1]). In particular, when the theory of the prosecution is that the larceny was committed by false pretenses, the indictment need not so specify. (See People v Duffy, 231 AD2d 586 [2d Dept 1996]; People v Cannon, 194 AD2d 496, 498 [1st Dept 1993]; People v Farruggia, 41 AD2d 894 [4th Dept 1973].) Here the grand larceny count nonetheless specifically alleges that the defendant committed the larceny “by means of false pretenses.” This form of larceny, Penal Law § 155.05 (2), is committed when a person obtains possession of personal property by means of “a false material statement about a past or presently existing fact.” CPeople v Norman, 85 NY2d 609, 619 [1995]; Penal Law § 155.05 [2] [a]; see, People v Churchill, 47 NY2d 151, 156 [1979].) In contrast, larceny by false promise is committed when, “pursuant to a scheme to defraud,” a person obtains property by means of an express or implied representation “that he . . . will in the future engage in particular conduct, and when he does not intend to engage in such conduct.” (Penal Law § 155.05 [2] [d]; see People v Ryan, 41 NY2d 634 [1977].)
In essence, the defendant’s argument is that by purchasing gas and paying for other vehicle-related expenses, he had, in fact, “incurred” those expenses, even though he charged them *326 to the KCDC credit card. According to the defendant, those expenses came to be incurred by the KCDC, and were no longer his own, only when the KCDC paid the credit card bills that included the charges for those expenses, an event which he says occurred after the vouchers were already submitted.[6] Relying on this argument, he insists that because they were, in fact, his expenses at the time the vouchers were submitted, he may not be charged with a larceny predicated upon an alleged misrepresentation relating “to a past or present fact” (People v Churchill, 47 NY2d at 156), but instead can only be charged with a larceny predicated on a false promise of future conduct, that is, an implicit promise that in the future the defendant, rather than the KCDC, would pay American Express for the charges.
The defendant’s argument is without merit. First, according to the evidence before the grand jury, the mileage allowance represented compensation, not only for gas and other out-of-pocket expenses related to the use of a personal car, but also for the expense of “wear and tear.” That expense was unquestionably incurred as the car was driven and not thereafter. Second, because the defendant paid for the out-of-pocket expenses, not with cash or a personal credit card, but with the corporate credit card furnished to him by the KCDC, the grand jury could find *327 that he did not incur those expenses when they were charged, and that the KCDC did. Since he was the designated cardholder, when he charged expenses to the card, the KCDC immediately became responsible for them. The argument advanced at oral argument — that if the KCDC did not pay for the charges, the defendant would have been liable for them — is both speculative and beside the point. If he, in fact, incurred such a contingent liability by using the card, it would not become an actual personal expense until that contingency arose, that is, until the KCDC refused to pay the charges (a decision that, as chairman, only he could make) and he was held personally liable for them. Thus, there was legally sufficient evidence before the grand jury to establish that the defendant made a misrepresentation concerning a past or present fact, that is, that he had incurred expenses in driving to and from Albany.
The defendant also argues that the evidence is legally insufficient because no complainant appeared before the grand jury asserting that he or she was the victim of the theft charged in the indictment. It is, of course, unnecessary for a complainant to lodge a complaint or appear before the grand jury in order to sustain a larceny charge. Appellate courts have, for instance, frequently upheld a defendant’s conviction for robbery, that is, for forcible stealing (see Penal Law § 160.00), even though the complainant did not testify against the defendant, whether because the complainant sustained severe injury in the commission of the robbery (People v Franco, 270 AD2d 160 [1st Dept 2000]); had been killed during the robbery (People v Dove, 233 AD2d 751 [3d Dept 1996]); was otherwise unavailable to testify (People v Smith, 278 AD2d 181 [1st Dept 2000]); or simply failed to testify without explanation (People v Williams, 286 AD2d 918 [4th Dept 2001]). Grafting such a requirement on a larceny prosecution in which the alleged victim is the State of New York, rather than an individual, would be particularly inappropriate, since a government entity can only “complain” through a representative individual, who does not have a personal stake in the loss alleged.[7]
Finally, the defendant alleges that the evidence before the grand jury is not sufficient to establish the necessary mens rea *328 for larceny by false pretenses, that is, that he intentionally made the false statements by which he obtained the property and did so with intent to defraud. In essence, the defendant claims that his entitlement to reimbursement under the circumstances, if not valid, was at the very least arguable, and that this uncertainty rendered the evidence of his larcenous intent insufficient. However, from the evidence that the car the defendant drove to and from Albany was leased for him by the KCDC, that he paid the expenses associated with driving the car with the KCDC credit card, and that he approved the payment of the credit card account bills that included those expenses, the grand jury could infer that, when he certified on the vouchers that he had incurred the expenses for which he was seeking reimbursement and that the amount he sought was “actually due and owing,” he knew the certification was false and he was seeking reimbursement under false pretenses. (See People v McDonald, 88 NY2d 281 [1996] [when defendant podiatrists convicted of larceny by false pretenses premised on statements that they had provided patients with orthotics “cast and fabricated” to patients’ feet claimed that evidence of “intent to defraud” was insufficient because term “casting” was ambiguous, Court of Appeals rejected claim based on expert testimony that term had universally recognized meaning in profession].)
The defendant also claims that the evidence underlying the counts charging the defendant with offering a false instrument for filing in the first degree is legally insufficient. This crime is committed, in relevant manner, by a person who offers to a public office or public servant a written instrument for filing, knowing that the instrument contains “a false statement or false information,” with intent to defraud the State or another governmental entity. (Penal Law § 175.35.) Each of the counts with which the defendant is charged refers to a particular voucher the defendant filed seeking reimbursement for travel expenses, including payment of the mileage allowance for travel to and from Albany. As previously stated, based on the evidence described above, the grand jury could find that when the defendant certified that he incurred the expenses for which he sought payment through each voucher, and was due an amount that included the mileage payments sought in the voucher, the defendant knew that he had not actually “incurred” the expenses for which he sought the mileage allowances, and that the amount each voucher sought was not actually the amount “due and owing.”
*329 In this connection, as in connection with the larceny count, the defendant argues that the statements in the vouchers were true when he made them, and that, if they became false, it was only after the KCDC paid the credit card bills on which the vehicle expenses were charged. Relying on the decision of the United States Supreme Court in Bronston v United States (409 US 352 [1973]), he claims that the statements were “literally true” when he made them and thus cannot be the basis of the false filing charges.
In Bronston, the defendant, under oath in a bankruptcy hearing, was asked if he had a bank account in a Swiss bank, and he answered, “No.” When then asked if he had ever had such an account, he responded (at 354), “The company had an account there for about six months, in Zurich.” Although he did not have a personal bank account in Switzerland at the time he testified, he had previously had such an account there. While his answer — that the company had a Swiss account — was, strictly speaking, true, it was also an implicit denial that he had ever had a personal Swiss account. Acknowledging that implication, the Supreme Court nonetheless ruled that a person could not be convicted for perjury “for an answer, under oath, that is literally true but not responsive to the question asked and arguably misleading by negative implication” (409 US at 353), even if the response was designed to mislead the questioner.
Bronston arose in the context of the questioning of a witness in a proceeding, and the Supreme Court’s holding, at least to some extent, relied on that context. The Court noted, for example, that “[i]f a witness evades, it is the lawyer’s responsibility to recognize the evasion and to bring the witness back to the mark, to flush out the whole truth with the tools of adversary examination” (id. at 358-359), and found that “any special problems arising from the literally true but unresponsive answer are to be remedied through the ‘questioner’s acuity’ and not by a federal perjury prosecution.” (409 US at 362; see United States v Hamilton, 3 Fed Appx 7, 11-12 [2d Cir 2001] [“The purpose of the Bronston rule is to place the burden on the examiner to probe for details during the examination”]; People v Neumann, 51 NY2d 658, 666 [1980] Bronston’s insistence upon thorough cross-examination was, thus, addressed to an answer literally true but unresponsive to the question because a half-truth”]; see also United States v Schafrick, 871 F2d 300, 303 [2d Cir 1989].) The Second Circuit has, nonetheless, applied the Bronston rule in cases in which a defendant was charged with viola *330 tion of 18 USC § 1001 for making a false statement in a written contract, where no opportunity for further questioning exists. (United States v Mandanici, 729 F2d 914 [2d Cir 1984].)
When a Bronston defense is raised, either in a case involving live testimony or a document, the court is obligated to examine, not only “the literal truth or falsity of defendant’s words, but also . . . the context in which these words were spoken.” (United States v Schafrick, 871 F2d at 303-304.) “If, in the context in which the statements were made, they were materially untrue, then perjury is established . . . even if the statements could be literally true in isolation.” (Id.) Because “[a]lmost any question or answer can be interpreted in several ways when subjected to ingenious scrutiny after the fact” (United States v Chapin, 515 F2d 1274, 1279-1280 [5th Cir 1975], quoting United States v Ceccerelli, 350 F Supp 475, 478 [WD Pa 1972]), the court must consider the question in the context in which it is posed. (United States v Chapin, 515 F2d at 1280; see also United States v Lighte, 782 F2d 367, 372 [2d Cir 1986] [in a false statement prosecution the issue is “whether the question — as the declarant must have understood it, giving it a reasonable reading — was falsely answered”].) Applying Bronston in a perjury prosecution, the New York Court of Appeals has agreed with these federal courts, noting that a “defendant’s words [cannot] be assayed for falsity out of the context in which they were spoken.” (People v Neumann, 51 NY2d at 665.)
In Neumann, a defendant who had testified that he had never discharged a “firearm” at the Prospect Park Zoo in Brooklyn was convicted of perjury based on evidence that he had, in fact, discharged a pellet gun and a rifle there. Noting that the Penal Law definition of “firearm” excluded both pellet guns and rifles, the defendant argued that his testimony was “literally true” and was thus not a proper basis for his perjury conviction. The Court of Appeals affirmed his conviction, holding that the meaning of the term “firearm,” as it was used in the allegedly perjurious questions and answers, was a question for the jury, and that “[t]here was ample evidence from which a jury could conclude that defendant used the term ‘firearm’ in a sense broad enough to include [both weapons] . . . .” (51 NY2d at 668.)
Similarly, in this case it was for the grand jury to determine what it meant to “incur” an expense, and when payment was “due and owing,” as those terms were used in the certifications the defendant signed. When those words are considered in the context of the vouchers’ purpose — reimbursing Assembly *331 Members for their “actual traveling expenses,” as provided in New York Constitution, article III, § 6, or for their “actual and necessary transportation expenses,” as provided in Legislative Law § 5 (2) — and in the context of the evidence before the grand jury concerning what the defendant knew about how the cars he drove and the expenses of operating them were paid for, the grand jury could subject the words to “a reasonable and definite interpretation” (United States v Chapin, 515 F2d at 1280), and find that the defendant’s certifications were literally and knowingly false.
The Propriety of the Grand Jury Proceedings: Expert
Testimony
The defendant moves to dismiss the indictment based on a variety of questions he raises concerning the integrity of the grand jury proceedings. A grand jury proceeding is defective when its integrity has been “impaired and prejudice to the defendant may result.” (CPL 210.35 [5].) Dismissal of an indictment is an “exceptional remedy . . . warranted only where a defect in the [grand jury proceedings] created a possibility of prejudice.” (People v Huston, 88 NY2d 400, 409 [1996].) Although the statutory test does not require that a defendant actually suffer prejudice in order for a court to find that the proceedings were impaired (id.; see People v Sayavong, 83 NY2d 702, 709, 711 [1994]; People v Wilkins, 68 NY2d 269, 276 [1986]), the test to determine impairment is, nonetheless, “very precise and very high.” (People v Darby, 75 NY2d 449, 455 [1990].) An indictment will not be dismissed because of “every improper comment, elicitation of inadmissible testimony, impermissible question or mere mistake.” (People v Huston, 88 NY2d at 409.) Dismissal is appropriate only where there has been “prosecutorial wrongdoing, fraudulent conduct or errors [that] potentially prejudice the ultimate decision reached by the Grand Jury.” (Id.)
The defendant’s generalized objections to the method and manner of the grand jury proceedings, and to the instructions given to the grand jury, are without merit. In particular, the minutes of the proceedings reveal that a quorum of grand jurors was present when testimony was taken and at the time the Assistant District Attorney instructed the grand jury on the law, and that it was instructed that only those grand jurors who had heard all of the evidence could participate in voting on the matter. The legal instructions given to the grand jury were not defective within the meaning of CPL 210.35.
*332 In addition to his general objections to the integrity of the proceedings and to the prosecutor’s legal instructions, the defendant makes several specific objections relating to the grand jury testimony of William Collins and Linda Stewart. Specifically, the defendant complains that, although neither witness was declared an expert in the grand jury, both testified as experts, both were asked questions that were inappropriate to put to an expert and for which there was not an adequate factual basis, and the grand jury was not instructed concerning its freedom to reject the opinion of an expert witness.
During the grand jury proceedings, both witnesses were questioned about the circumstances under which a Member of the Assembly would be entitled to reimbursement. Mr. Collins testified that if a Member of the Assembly received payment for his expenses from another source, he would not have incurred those expenses and would not be entitled to reimbursement for them. More specifically, he testified that if a Member of the Assembly did not have to pay for a personal vehicle or pay the expenses of a personal vehicle, reimbursement for those expenses would not be consistent with Legislative Law § 5 (2).[8] Similarly, when Ms. Stewart was asked whether the defendant “would have the right to receive reimbursement or submit for reimbursement vouchers for expenses that he did not himself pay,” she testified that he would not, and when she was asked *333 whether the purpose of those vouchers he submitted was to reimburse him for expenses that he incurred, she testified that it was. Although the People claim that the questions that elicited this testimony were “fact questions,” they called for Mr. Collins or Ms. Stewart to express an opinion, based on his or her expertise, concerning whether a Member of the Assembly who did not pay for an expense “incurred” one, and whether a Member who had not incurred an expense could seek reimbursement for that expense. The answers they gave, then, constituted expert testimony.
It is not, however, a prerequisite for a witness to give expert testimony that the witness be explicitly declared an expert before the factfinder; even without a formal declaration, such testimony is permissible so long as the witness’s expertise is adequately demonstrated. (People v Leung, 272 AD2d 88 [1st Dept 2000]; People v Highsmith, 254 AD2d 768 [4th Dept 1998]; People v Duchowney, 166 AD2d 769 [3d Dept 1990].) There is “[n]o precise rule ... as to the exact manner in which [a witness’s] skill and experience must be acquired” before the witness may be qualified as an expert in a particular field. (Meiselman v Crown Hgts. Hosp., 285 NY 389, 398 [1941].) “Long observation and actual experience, though without actual study of the subject, qualify a witness as an expert in that subject.” (Id.) A witness’s education, training or experience may be considered in the somewhat flexible evaluation of his expertise. (Werner v Sun Oil Co., 65 NY2d 839 [1985]; Caprara v Chrysler Corp., 52 NY2d 114, 121 [1981]; People v Greene, 153 AD2d 439 [2d Dept 1990]; see also People v Gonzalez, 99 NY2d 76 [2002]; People v Duchowney, 166 AD2d 769 [3d Dept 1990].) In this case, given the background, experience and responsibilities to which Mr. Collins and Ms. Stewart each testified, each was adequately qualified to answer the questions put to them.
A qualified witness may be permitted to testify as an expert when “the proffered . . . testimony ‘would aid a lay jury in reaching a verdict.’ ” (People v Lee, 96 NY2d 157, 162 [2001], quoting People v Taylor, 75 NY2d 277, 288 [1990] [expert opinion admissible “when it would help to clarify an issue calling for professional or technical knowledge, possessed by the expert and beyond the ken of the typical juror”]; see also People v Brown, 97 NY2d 500, 505 [2002] [“the trial court must decide whether, depending on the facts of each case, the proffered expert testimony would be helpful in aiding a lay jury reach a verdict”].)
*334 Because the admissibility of expert testimony is dependent upon the purpose for which it is being offered (People v Brown, 97 NY2d at 505, citing People v Taylor, 75 NY2d at 292), it is not to be excluded “merely because, to some degree, it invades the jury’s province.” (People v Lee, 96 NY2d at 162.) By its nature, “[e]xpert opinion testimony . . . is a kind of authorized encroachment” on “the jury’s otherwise exclusive province which is to draw conclusions from the facts.” (Id. [citation and internal quotation marks omitted]; see also People v Cronin, 60 NY2d 430, 432 [1983].) If jurors are unable “to draw conclusions from the evidence based on their day-to-day experience, their common observation and their knowledge, and when they would be benefitted by the specialized knowledge of an expert witness,” expert testimony should be allowed. (People v Brown, 97 NY2d at 505, citing People v Cronin, 60 NY2d at 433.) Simply put, if the subject of the testimony involves “information or questions beyond the ordinary knowledge and experience of the trier of the facts,” the testimony should be admitted. (Matott v Ward, 48 NY2d 455, 459 [1979].)
The testimony the defendant challenges here — the application of the rules established by the Legislature, in accordance with the Constitution and the statutory law, for reimbursement of expenses to Members of the New York State Assembly — was admissible because it served “to clarify an issue calling for professional or technical knowledge, possessed by the expert and beyond the ken of the typical juror.” (People v Taylor, 75 NY2d 277, 288 [1990].) Although at least to some degree legal in nature, the testimony was directly relevant to determinations the grand jury would be called upon to make. (See People v Lurie, 249 AD2d 119 [1st Dept 1998] [attorney allowed to explain the law of cooperative conversions]; Lurie v Wittner, 1999 WL 246809, 1999 US Dist LEXIS 5853 [SD NY, Apr. 26, 1999] [error for a court to preclude a defendant’s attorney from testifying about the defendant’s completion of financial disclosure forms]; see also People v Fish, 81 AD2d 975 [3d Dept 1981] [testimony of law school professor as expert witness concerning materiality of statement in perjury case properly admitted].)
The defendant also objects to the witnesses’ testimony on the ground that they were improperly asked the “ultimate question” based on facts that were not in evidence. This claim is without merit because the witnesses were not asked the “ultimate question” before the grand jury, because to whatever *335 extent the questions approached the “ultimate question,” they did not do so improperly, and because there was an adequate factual basis for the questions.
If expert testimony is helpful to the jury, “it matters not whether the testimony related to the ultimate issue in the case.” (People v Hicks, 2 NY3d 750, 751 [2004]; see also Dufel v Green, 84 NY2d 795, 798 [1995] [“If the jury requires the benefit of the expert’s specialized knowledge, the expert’s opinion should be allowed even when it bears on an ultimate question . . .”].) The test to be applied “is one of need” depending upon “the unique circumstances of each case.” (Id.) The
“[admissibility of opinion testimony pertaining to an ultimate question within the jury’s province turns on whether, given the nature of the subject, ‘the facts cannot be stated or described to the jury in such a manner as to enable them to form an accurate judgment thereon, and no better evidence than such opinions is attainable.’ ” (People v De Sarno, 121 AD2d 651, 654 [2d Dept 1986], quoting Noah v Bowery Sav. Bank, 225 NY 284, 292 [1919]; Van Wycklyn v City of Brooklyn, 118 NY 424, 429 [1890].)
Thus, the Second Department held that it was proper in an arson case for an expert witness to give his opinion that the fires the defendant was charged with intentionally setting were not “chemically, mechanically, electrically or naturally caused, thus eliminating all nonsuspect causes.” (People v Maxwell, 116 AD2d 667, 668 [2d Dept 1986]; see also People v Rivera, 131 AD2d 518, 518 [2d Dept 1987] [approving fire marshal’s testimony that “based upon his investigation, he had eliminated ‘to a reasonable degree of scientific certainty’ all possible ‘natural’ and ‘accidental’ causes of the fire”].) For the same reason, the Court of Appeals has permitted expert witnesses in rape and sexual abuse cases to testify concerning rape trauma syndrome and abused child syndrome in order “to explain behavior of a victim that might appear unusual or that jurors may not be expected to understand.” (People v Carroll, 95 NY2d 375, 387 [2000]; see also People v Taylor, 75 NY2d 277 [1990]; People v Keindl, 68 NY2d 410, 422 [1986].)
There are, of course, limits to how far an expert’s testimony may go. An expert in a rape or sexual abuse case may not offer an opinion that the complainant was actually raped or abused (People v Carroll, supra; People v Taylor, supra; People v Keindl, *336 supra; see also People v Perry, 180 AD2d 766 [2d Dept 1992]), and an expert in an arson case may “not actually state a conclusion as to the ultimate issue in the case, i.e.,. whether or not the fires were intentionally set.” (People v Maxwell, supra at 668; see also People v Rivera, supra.) Similarly, while a police officer who qualifies as an expert may be permitted to testify that the packaging or quantity of drugs recovered from a defendant was consistent with his intending to sell them (see People v Hicks, 2 NY3d at 751 [packaging]; People v Resek, 307 AD2d 804, 805 [1st Dept 2003], lv granted 1 NY3d 603 [2004] [quantity]; but see People v Brown, 97 NY2d 500, 506 [2002] [trial court “properly precluded the sergeant from opining that defendant sold drugs to the undercover or even that defendant’s specific actions or behavior were consistent with participation in a street drug sale”]), an expert unquestionably may not testify that the quantity of drugs a defendant possessed indicated that the defendant possessed the drugs with the intent to sell them. (Id.-, People v Ingram, 2 AD3d 211 [1st Dept 2003]; People v Wright, 283 AD2d 712 [3d Dept 2001].)
In particular, asking an expert whether the defendant intended to commit a charged crime is impermissible not only because “the expert’s perception of that term might differ dramatically from the statutory definition” (People v De Samo, 121 AD2d at 654, quoting People v Cronin, 60 NY2d 430, 433 n 2 [1983]), but also because an opinion on such a matter “[does] not involve professional knowledge outside the range of ordinary training or intelligence” and jurors are “fully capable of comprehending the issues and evaluating the evidence as it relate[s] to the defendant’s intent.” (People v Robinson, 191 AD2d 595, 596-597 [2d Dept 1993] [error for People’s medical expert to testify to opinion that injury to complainant’s eye could not possibly have resulted from “an accidental poke in the eye”].)
In this case the witnesses offered, in essence, two opinions, one more general than another: first, that a Member of the Assembly (including the defendant) would not incur an expense if the Member did not pay for it, and could not properly receive reimbursement for an expense the Member had not incurred; and second, and more specifically, that if a Member did not pay for a vehicle or for its expenses, the Member could not, consistent with Legislative Law § 5 (2), properly be reimbursed for using it. Because these opinions concerned matters beyond the jury’s ken, matters which the grand jury needed to understand in order to make its determinations, it was not improper to *337 elicit them. Significantly, though the testimony of these witnesses bore on the “ultimate questions” before the grand jury, each was asked only hypothetical questions, neither was ever asked whether the defendant, in fact, had or had not incurred a particular expense, and — most importantly — neither was asked what the defendant knew or intended. Thus, neither directly addressed whether the defendant, by submitting the vouchers and receiving payment on them, committed larceny and intentionally made false statements with intent to defraud the State of New York.
The defendant claims that there was no factual basis to question these witnesses about whether a Member of the Assembly was entitled to reimbursement for expenses the Member had not incurred, arguing again that when he purchased gasoline and paid for maintenance and other car-related expenses, he did, in fact, “incur” those expenses despite the fact that he paid for them with the KCDC credit card. For the reasons explained above, even if the defendant assumed a contingent liability when he used the credit card, the grand jury could find that the KCDC, and not the defendant, incurred the expenses when its credit card was used. Given the evidence that the car the defendant drove was leased by the KCDC, and that the gas and other expenses relating to the car were charged to the credit card, there was a factual basis for asking the witnesses hypothetical questions about the propriety of reimbursing expenses a Member had not incurred.
Finally, the defendant complains that the prosecutor failed to instruct the grand jury concerning the evaluation of expert testimony. The People concede that when the grand jury was asked to consider the crimes charged in the above-captioned indictment, they were not instructed that they should evaluate the testimony of experts like that of other witnesses and that they were free to reject such opinions. However, the People point out, and the court’s own review of the grand jury minutes confirms, that the grand jury received such instructions the very same day in connection with another presentation relating to this same defendant,[9] and that the grand jury received these instructions before being charged concerning this indictment and before voting to return it. Assuming the grand jurors recognized that what they had heard from Mr. Collins and Ms. *338 Stewart was expert testimony to which the prior instructions applied, the People may rely “on [these] instructions, given earlier in the day to the same grand jury.” (People v Brown, 176 AD2d 155, 156 [1st Dept 1991], affd on other grounds 81 NY2d 798 [1993]; see also People v Alarcon, 184 AD2d 514 [2d Dept 1992].)
In any case, because a grand jury has ordinarily fulfilled its function “when it has issued an indictment upon evidence that is legally sufficient to establish that the accused committed a crime (CPL 190.65, subd 1),” a prosecutor is not required to instruct the grand jury “with the same degree of precision that is required when a petit jury is instructed on the law.” (People v Calbud, Inc., 49 NY2d 389, 394 [1980].) Thus, a prosecutor’s instructions to the grand jury are “sufficient if the District Attorney provides the Grand Jury with enough information to enable it intelligently to decide whether a crime has been committed and to determine whether there exists legally sufficient evidence to establish the material elements of the crime.” (49 NY2d at 394-395.) It is only when the prosecutor’s instructions were “so incomplete or misleading” that they “substantially undermine this essential function, [that] it may fairly be said that the integrity of that body has been impaired.” (Id. at 395.)
In some cases, there may be conflicting evidence on an important question of fact upon which an expert offered an opinion. In such a case, instructing the grand jury concerning its freedom to accept or reject the opinion of an expert witness may be important to insure that the grand jury serves its function to determine independently whether the People have met their burden of proof. In People v Gladden (118 Misc 2d 831 [Sup Ct, Kings County 1983]), for example, a mother was indicted for assault based on the theory that she had caused the child physical injury by failing to feed her, and the People offered the grand jury expert testimony from a doctor that the child was, in fact, injured in this way. However, eyewitnesses contradicted the expert’s opinion by testifying that they had seen the defendant feed the child several times. The court held that although “[t]here would ordinarily be no necessity” for giving the grand jury an instruction concerning the evaluation of expert testimony, given the conflict between the eyewitnesses and the expert, “[w]ithout an instruction as to the proper manner of evaluation of expert testimony, the Grand Jury could not properly evaluate this contradictory testimony.” (118 Misc 2d at 835.) For this and other reasons, the court dismissed the indict *339 ment. Here, however, there was no such conflict in the evidence for the grand jury to resolve. As in People v Delaney (125 Misc 2d 928, 929 [Suffolk County Ct 1984]), “[t]he omission of an instruction concerning the weight, if any, to be accorded an expert’s testimony [was] not of such magnitude as to prejudice the defendant’s interests, to the extent that the integrity of the Grand Jury [was] impaired thereby.”
In any case, in addition to hearing the opinions of these two witnesses, the grand jury was also informed, and properly so, that Legislative Law § 5 (2) provides that “[e]ach member of the legislature shall receive payment of actual and necessary transportation expenses . . . ,” and the vouchers the defendant submitted, which were in evidence before the grand jury, required the defendant to certify that he had “incurred” the expenses for which he was seeking payment. Given this other evidence, it is highly unlikely that giving the grand jury an instruction that they could reject the expert testimony they heard in this case — that a Member of the Assembly was not entitled to reimbursement for expenses the Member had not paid for— would have changed the grand jury’s determinations.
Finally, the defendant contends that the 76 pairs of “Quick Pay Vouchers” and corresponding “NYS Assembly Member Per Diem Expenses Reimbursement Vouchers” were not properly admitted during the course of Mr. Collins’ testimony. He does not argue, however, that these documents were irrelevant, unlawfully obtained or otherwise inadmissible, but only that an insufficient foundation had been laid for their admission. Although the defendant correctly observes that the prosecutor announced that he was admitting the documents into evidence before laying a sufficient foundation for doing so, he did thereafter ask Mr. Collins questions which established their admissibility as business records, and did so before posing any questions regarding their substance. Proceeding in this manner, while perhaps technically incorrect, neither impaired the integrity of the proceedings nor created any likelihood of prejudice to the defendant.
Defective Allegations in the Indictment
The defendant also claims that the indictment itself is defective because its factual allegations are inadequate. The Court of Appeals held long ago that allegations in an indictment that track the language of the statute defining the offense charged are legally sufficient. (People v Levin, 57 NY2d 1008 [1982]; *340 People v Iannone, 45 NY2d 589 [1978]; see also People v Duffy, 231 AD2d 586 [2d Dept 1996].) Indeed, the Court has gone further, holding that specific reference to the name and section number of the statute alleged to have been violated constitutes jurisdictionally sufficient allegations of all the elements of a crime. (People v Cohen, 52 NY2d 584 [1981].)
In this case, the indictment goes well beyond what is required. A larceny count need not specify that the defendant committed the larceny in any particular manner, unless the theory of prosecution is that the larceny was from a person or was committed by extortion (Penal Law § 155.45 [1]). In particular, as already noted, a larceny count need not specify that the larceny was committed by false pretenses when that is the theory of the prosecution (see People v Duffy, supra; People v Cannon, supra; People v Farruggia, supra), and here the first count of the indictment, charging the defendant with grand larceny in the third degree, specifically alleges that the defendant committed the larceny by false pretenses. Even more particularly, it alleges that the property stolen was United States currency the defendant sought and obtained from the State of New York as “reimbursement for travel expenses ... by means of false pretenses in written instruments that the defendant offered for filing.”
While the time period specified in the grand larceny count is a broad one, it is clear from the count itself, and from the further particularization provided by the People, that the People allege that the individual acts of larceny aggregated in the count were committed when the defendant submitted each of the vouchers which are the subject of the remaining counts, on the dates specified in those counts, and thereafter received payment on those vouchers.[10] Thus, this count of the indictment, along with the discovery the defendant has received, provides sufficient information for the defendant to prepare and present a defense. (See People v Cannon, 194 AD2d at 496; see also People v Iannone, supra [where allegations of indictment are sufficient, but provide insufficient information to advise defendant of specific information, bill of particulars or discovery can cure deficiency].)
*341 Each of the other 76 counts, which charge the defendant with offering a false instrument for filing in the first degree, concerns a particular voucher the defendant allegedly filed, and, beyond the statutory language of the offense, alleges that each voucher contained a false statement and false information “concerning travel expenses that the defendant purported to incur in Kings and other counties.” Each count specifies the voucher to which it relates, and the defendant has been permitted to inspect and copy all of the vouchers. Although the defendant complains that these counts do not specify what statement or information was false, and in what respect it was false, each count does allege, in general terms, that the false statement or information “concern[ed] travel expenses that the defendant purported to incur in Kings and other counties.” Moreover, at oral argument, the People further specified, as part of their bill of particulars, that “the false statement or information” in each of the vouchers was contained in the certification that “the above expenses were incurred in the rendering of legislative duties and that the above bill is just, true and correct and that the balance shown is actually due and owing,” and that it was false in that the defendant had not incurred the expenses for which he sought the mileage allowance, and to that extent the balance shown was not due and owing. Thus, as with the first count, these counts of the indictment, along with the discovery the defendant has received, provide sufficient information for the defendant to prepare and present a defense.
Geographical Jurisdiction
The defendant asserts that Kings County has no jurisdiction over the crimes charged in the indictment because the defendant committed all of the acts the People allege constitute commission of the crimes outside of the county. While conceding that the defendant committed relevant acts outside the county, and that he could have been charged with these crimes elsewhere, the People contend that jurisdiction nonetheless lies in Kings County pursuant to CPL 20.40 (4) (k) and 20.40 (1).
A defendant “has the right at common law and under the State Constitution to be tried in the county where the crime was committed unless the Legislature has provided otherwise.” (People v Ribowsky, 77 NY2d 284, 291 [1991]; People v Green-berg, 89 NY2d 553 [1997]; see also NY Const, art I, § 2.) Geographical jurisdiction is a question of fact. (Matter of Stein-gut v Gold, 42 NY2d 311, 316 [1977].) Because jurisdiction is *342 not an element of a crime, the People must only establish in the grand jury by a preponderance of the evidence that the county in which the crime is being prosecuted has jurisdiction over the matter. (People v Greenberg, supra-, People v Ribowsky, 77 NY2d at 291; Matter of Steingut v Gold, 42 NY2d at 316 [jurisdiction need not be proven beyond a reasonable doubt, “(a) 11 that is required is that jurisdiction can be fairly and reasonably inferred from all the facts and circumstances introduced into evidence”].) The People must establish that either the crime was committed in the county in which the crime is being prosecuted, or that jurisdiction lies under one of the statutory exceptions. (People v Ribowsky, 77 NY2d at 291-292; People v Tullo, 34 NY2d 712 [1974].)
One of the two provisions upon which the People rely for jurisdiction is CPL 20.40 (1) (a), which states that a person may be convicted in a particular county of an offense when “[c]onduct occurred within such county sufficient to establish . . . [a]n element of such offense . . . .” The defendant contends that because he completed and filed the vouchers in Albany, received payment for the expenses claimed in the vouchers in Albany, and drove and paid for car-related expenses in various counties between Brooklyn and Albany, there was no conduct in Kings County sufficient to establish any of the elements of the crimes with which he is charged.
When a crime requires proof of a particular mens rea, evidence of conduct in a county evidencing that mens rea is enough to vest jurisdiction in that county, even if the actus reus of the crime occurred in another county. For example, if evidence permitted a jury to draw an inference that the defendant manifested the intent to commit a murder in one county, that county would have jurisdiction over the murder even if it occurred in a different county. (See, e.g., People v Seifert, 152 AD2d 433 [4th Dept 1989]; People v Lovacco, 147 AD2d 592 [2d Dept 1989].) The same is true for larcenies and false filings: if conduct occurs in one county evincing a defendant’s larcenous intent and knowledge of the falsity in the instrument, both crimes may be prosecuted in the county even though the larceny was committed and the instrument filed in another county. (See, e.g., People v Camiola, 225 AD2d 380 [1st Dept 1996] [in neglecting to prepare gift tax returns for a client in connection with purported gifts to him, defendant evinced in New York County his intention of evading tax consequences in connection with his own state income tax returns, an element of the crime of of *343 fering a false instrument for filing in the first degree, thus vesting that county with jurisdiction over the offense]; People v Chaitin, 94 AD2d 705, 705 [2d Dept 1983] [“While it is undisputed that the incriminating invoices . . . were completed and signed by defendant at the clinic in Kings County, the acts of completion are not of themselves elements of the crime. What they do suffice to show — in view of the other evidence in the case — is that defendant had knowledge of the falsity of the invoices when he completed them in Kings County and that he had the intent to defraud while in Kings County”]; see also People v Burks, 254 AD2d 738 [4th Dept 1998].)
While there was no evidence presented in the grand jury concerning where the defendant completed the reimbursement vouchers, the grand jury did hear that the vouchers were submitted in Albany and that the defendant received payment on them there. Nonetheless, there was substantial evidence before the grand jury of conduct in Kings County. According to that evidence, every voucher the defendant submitted contained a request for the mileage allowance for a round trip to Albany that originated and terminated in Brooklyn. The defendant chaired the KCDC, which was headquartered at 16 Court Street in Brooklyn. The three cars the defendant used to travel between Brooklyn and Albany during the period of the indictment were leased by the KCDC and registered to the defendant at the KCDC’s address or another address in Brooklyn, presumably the defendant’s home; and the insurance cards listed the cars at one or the other Brooklyn addresses. For 3½ years, the defendant regularly and repeatedly charged expenses, such as gas and maintenance work for the cars, to the KCDC’s corporate American Express account. Many of those charges were made in Kings County, and the KCDC account was billed to the defendant at an address in Brooklyn. After payment was approved by the defendant, the treasurer of the KCDC signed the checks by which the bills were paid at his office in Brooklyn.
This evidence was sufficient to establish that the defendant, throughout the period covered by the indictment, engaged in conduct in Kings County from which the grand jury could infer his knowledge that he did not pay for, and thus did not incur, the expenses for which he sought reimbursement for driving to Albany from Brooklyn and to Brooklyn from Albany. In other words, the grand jury could find from this evidence that he sought and obtained payment on the vouchers with the intent required for larceny by false pretenses, and that he possessed *344 this intent in Brooklyn as well as in Albany. And from this evidence, the grand jury could find that he presented the vouchers for payment knowing they contained false statements or information, the mens rea required for the crime of offering a false instrument for filing, and that he possessed this knowledge, too, in Brooklyn as well as in Albany. Thus, Kings County has jurisdiction over the offenses pursuant to CPL 20.40 (1) (a).
While the prosecutor who instructed the grand jury on the law advised the grand jurors of the People’s alternative theory of jurisdiction under CPL 20.40 (4) (k) (ii), discussed below, he did not inform them of the provisions of CPL 20.40 (1) (a). However, evidence relevant to the defendant’s intent and knowledge based on conduct in Kings County was, as required, placed before the grand jury (see Matter of Steingut v Gold, supra, 42 NY2d at 316-317 [“Where, as here . . . it is clear that all of the allegedly criminal activity occurred in another county, the jurisdiction of the county seeking to prosecute for that activity must be established before the Grand Jury”]). Given the importance of this evidence in establishing the defendant’s knowledge of how the cars and car-related expenses were paid for, there can be little doubt that the grand jury, which found the defendant to have the requisite culpable mental states for the crimes with which they charged him, would also have found that “[c]onduct occurred within [Kings] county sufficient to establish ... an element of [these] offense[s].” Accordingly, the integrity of the grand jury was not impaired by the failure to instruct the grand jury concerning this jurisdictional theory. (See People v Crean, 115 Mise 2d 996, 1002 [Westchester County Ct 1982] [finding “harmless the Deputy Attorney-General’s failure to instruct the Grand Jury on the question of geographical jurisdiction, given the fact that the Grand Jury heard the relatively straightforward and simple facts” establishing that the “result” of the offense occurred in Westchester County].)[11]
The People also assert that there is jurisdiction in Kings County pursuant to CPL 20.40 (4) (k), which provides that *345 Subdivision (4) (k), which is “designed to expand jurisdiction beyond the county where a false instrument is filed” (Preiser, Practice Commentaries, McKinney’s Cons Laws of NY, Book 11 A, CPL 20.40, at 135), permits any county in which the instrument was executed or the “goods and services” were provided to assume jurisdiction over these crimes (Matter of Sharpton v Turner, 169 AD2d 947, 949 [3d Dept 1991]).[12] In his Commentary to this provision, Professor Preiser notes that it authorizes venue in counties in which the instrument was executed or the goods or services were obtained, “irrespective of whether those acts are sufficient to establish an element of the offense.” (Preiser, supra at 135-136.)
“[a]n offense of offering a false instrument for filing, or of larceny by means of a false pretense therein, may be prosecuted (i) in any county in which such instrument was executed, in whole or in part, or (ii) in any county in which any of the goods or services for which payment or reimbursement is sought by means of such instrument were purported to have been provided.”
Throughout the period set forth in the indictment, the defendant charged the cost of gas he obtained in Brooklyn, and the cost of the maintenance work he had performed on the cars in Brooklyn. The People claim that the purchases of gas and maintenance in Kings County were “goods or services” for which the defendant sought reimbursement through the vouchers, and provided jurisdiction over the larceny and false filing offenses to which they related. The defendant claims that the payments he received pursuant to the vouchers he filed were not for “goods or services” like gasoline or maintenance, but instead, were for the “services” he rendered by his presence in Albany as an Assemblyman.
The defendant’s claim to the contrary, it is clear from the evidence before the grand jury that the purpose of the vouchers was to provide Members of the Assembly with reimbursement *346 for their “actual and necessary transportation expenses . . . , while in travel status in the performance of [their] duties” (Legislative Law §5 [2]), including, if the Member chose to use a personal vehicle, a mileage allowance as reimbursement for the expense of driving the vehicle to and from Albany. The gas the defendant purchased for the cars in Brooklyn certainly constituted “goods,” and the maintenance work the defendant had done on the car in Brooklyn was certainly “services.” Thus, Kings County was, in the meaning of CPL 20.40 (4) (k) (ii), a county “in which any of the goods or services” for which the defendant sought “payment or reimbursement. . . were purported to have been provided.” (See People v LanFranco, 278 AD2d 8 [1st Dept 2000] [merchandise located in Bronx County for which defendant fraudulently sought insurance recovery constituted “goods . . . for which payment or reimbursement (was) sought” within the meaning of CPL 20.40 (4) (k) (ii)].) On this basis, Kings County has jurisdiction over those crimes charged in the indictment that relate to the vouchers in which the defendant claimed a mileage allowance, in part, as reimbursement for those expenses.[13]
Separation of Powers
The defendant also contends that he may not be prosecuted for the crimes charged in the indictment because the doctrine of separation of powers precludes the judicial branch from answering what he asserts is a nonjusticiable political question: whether, under the circumstances of this case, he was entitled to reimbursement for travel expenses.[14] While New York has no *347 “hard and fast” rules for determining what constitutes a political question, generally a court “will abstain from venturing into areas if it is ill-equipped to undertake the responsibility and other branches of government are far more suited to the task.” (Jones v Beame, 45 NY2d 402, 409 [1978].) For this reason, “courts do not normally have overview of the lawful acts of appointive and elective officials involving questions of judgment, discretion, allocation of resources and priorities.” (Matter of Lorie C., 49 NY2d 161, 171 [1980].)
Generally, determinating whether particular conduct falls within the “proper duties” of a legislator is a nonjusticiable political question. (See People v Ohrenstein, 77 NY2d 38, 46 [1990].) And, as the defendant points out, the Constitution vests power in the Legislature to create a budget, to appropriate funds paid from the treasury, and to authorize expenditures to the Assembly for travel expenses. By legislative enactment and according to the rules of the Speaker of the Assembly, travel expenses of Members of the Assembly are paid with the approval and at the “prerogative” of the Speaker. However, this constitutional and statutory background does not transform into a legislative act the defendant’s mundane conduct in seeking and obtaining payment of mileage allowances for his trips to and from Albany, nor does it render a determination of whether it was proper to seek and obtain the particular payments at issue here a political question. The theory of the prosecution in this case does not call into question the propriety of reimbursing Members of the Assembly for their travel expenses or of the procedure the Assembly has used to do so. To the contrary, because the theory of the prosecution accepts the legislative rules for travel reimbursement, and because these rules are judicially discoverable and manageable, neither the court nor a jury will be required to make any policy decisions regarding those rules.
As previously indicated, the New York State Constitution limits its mandate for reimbursement of a legislator’s traveling expenses to and from Albany to reimbursement for his or her “actual traveling expenses,” and Legislative Law § 5 (2) similarly provides only for payment of a legislator’s “actual and necessary transportation expenses . . . while in travel status in *348 the performance of his or her duties.” All expenses are to be paid upon approval of the Speaker of the Assembly, and expenditures from appropriations for the support of Assembly purposes are payable upon audit by the State Comptroller of vouchers that are certified by the Speaker. (Legislative Law § 12 [4], [7].) Consistent with Legislative Law § 5 (2), the vouchers the defendant submitted required that he certify that the expenses for which reimbursement are sought were “incurred in the rendering of legislative duties” and that the balance indicated was “just, true and correct” and “actually due and owing.”
Thus, a court or jury need not decide whether reimbursement is limited to “actual traveling expenses,” since the Legislature has already made that determination. Determining whether the defendant himself “actual[ly] incurred” the expenses at issue in this case may require application of the Legislature’s rules, but doing so in no way requires divining or questioning legislative judgments or acts of discretion. (See Board of Educ. v City of New York, 41 NY2d 535, 538 [1977] [“While in general the courts will not interfere with the internal procedural aspects of the legislative process, judicial review may be undertaken to determine whether the Legislature has complied with constitutional prescriptions as to legislative procedures”]; Anderson v Krupsak, 40 NY2d 397 [1976] [determining whether election of three Regents by Legislature was valid under controlling statute was not internal legislative matter, but question of law proper for court to answer].)
In People v Ohrenstein (supra), the Court of Appeals held that because the Legislature itself had not defined what fell within the “proper duties” of its staff, legislative employees who did some work for a Member of the New York State Senate could not be prosecuted for larceny and false filings based on the theory that the work they did was not “proper.” Such a prosecution was impermissible because it would have required the judicial branch, rather than the Legislature itself, to determine what those “proper duties” were, and to draw the line between political activities that were “proper” and those that were not. (77 NY2d at 48 [noting that “the prosecutor’s objection to the defendants’ use of Senate staff for the campaigns is not based on the fact that it is a political activity but on the belief that it is too political”].) On the other hand, the Court in Ohrenstein found no bar to the prosecution of “no-show” employees who allegedly did no work, since in such a prosecution, “there is no *349 question as to what ‘proper duties’ include, because no matter how they are defined, they must at least include the performance of some services, of some type, at some time.” (77 NY2d at 53.) Similarly, the prosecution in this case would likely have been barred if it had been premised on the theory that the defendant’s activities in Albany had been purely “political,” and — for that reason — his certification on the voucher that he had incurred travel expenses “in the rendering of legislative duties” was false. There is, however, no bar to this prosecution, since it challenges, not that he incurred travel expenses “in the rendering of legislative duties,” but rather that he incurred them at all.
Nor is the conduct with which the defendant is charged protected by the Speech or Debate Clause of the New York State Constitution. The purpose of the clause, which provides that “[f]or any speech or debate in either house of the legislature, the members shall not be questioned in any other place” (NY Const, art III, § 11), is to protect the integrity of the legislative process by not inhibiting a legislator’s speech out of fear of litigation. (Oates v Marino, 106 AD2d 289 [1st Dept 1984] [Senator’s allegedly defamatory remarks made during public hearing were protected under clause]; see also United States v Brewster, 408 US 501, 507 [1972] [“(t)he immunities of the Speech or Debate Clause . . . (exist) to protect the integrity of the legislative process by insuring the independence of individual legislators”].) While the interpretation of the clause has been expanded to incorporate some legislative activity beyond floor speeches and House debate, the act in question must still be legislative in nature.
Thus, the Court of Appeals has said that the clause applies to committee meetings and hearings that do not occur on the floor of the House (People v Ohrenstein, 77 NY2d at 54; see also Matter of Straniere v Silver, 218 AD2d 80, 83 [3d Dept 1996]), but “does not extend to acts which a legislator performs to secure support in the community or to insure reelection, such as giving speeches in the community, issuing newsletters and press releases, or arranging for the publication of books.” (People v Ohrenstein, 77 NY2d at 54, citing Hutchinson v Proxmire, 443 US 111 [1979].) In order to be protected by the Speech or Debate Clause, the legislative act must be an “integral part of the deliberative and communicative processes by which Members participate in . . . proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect *350 to other matters which the Constitution places within the jurisdiction of either House.” (Straniere v Silver, 218 AD2d at 83, quoting Gravel v United States, 408 US 606, 625 [1972].)
It is hard to imagine how submitting a voucher for reimbursement of travel expenses could ever be considered an “integral part of the deliberative and communicative processes” of legislators considering proposed legislation or “other matters which the constitution places within the jurisdiction of either House.” A strained argument might be made that a Member’s presence in Albany is essential to those “deliberative and communicative processes,” and thus that a prosecution which challenges a Member’s reimbursement for expenses incurred in traveling there violates the Speech or Debate Clause. But such an argument goes too far, since there is nothing “legislative” about submitting a travel voucher, and it cannot be construed as “speech or debate” the clause is meant to protect. Similarly, “the independence of individual legislators” is in no way diminished by prosecuting a Member of the Assembly for allegedly seeking and obtaining reimbursement for travel expenses he did not actually incur. As the Court of Appeals has observed, “no matter how far the immunity [of the Speech or Debate Clause] may extend under the State Constitution, it cannot be said that it was intended to provide a sanctuary for legislators who would defraud the State . . . .” (People v Ohrenstein, 77 NY2d at 54.)
Dismissal in the Interest of Justice
Finally, the defendant moves for dismissal of the indictment in the interest of justice pursuant to CPL 210.20 (1) (i) and 210.40. He alleges that because the procedures for reimbursement for travel expenses were “too vague and generalized,” deviation from those procedures should not form the basis of criminal charges. Specifically, he contends that because the vouchers do not limit reimbursement to legislators who traveled in a car they themselves owned, he was not on notice of that requirement. Coupling this lack of notice with his position and life history, he asserts that dismissal is appropriate. The People oppose the defendant’s motion.
A court may dismiss an otherwise valid indictment in the interest of justice when “such dismissal is required as a matter of judicial discretion by the existence of some compelling factor, consideration or circumstance clearly demonstrating that conviction or prosecution of the defendant upon such indict *351 ment . . . would constitute or result in injustice.” (CPL 210.40 [1].) “In rendering its determination, the court must engage in a ‘sensitive balancing of the interests of the individual and the People’ ” (People v Bebee, 175 AD2d 250, 250 [2d Dept 1991], quoting People v Rickert, 58 NY2d 122, 127 [1983]), and review the facts of the case and evaluate them in light of the criteria set forth in CPL 210.40 (1) (a) through (j), both “individually and collectively.” (People v Clayton, 41 AD2d 204, 208 [2d Dept 1973].)
While the court is obligated to set forth its findings, “the statute does not compel catechistic on-the-record discussion of items (a) through (j) ... to indicate that in fact all applicable items have been considered.” (People v Rickert, 58 NY2d at 128.) A court should find that “some compelling factor, consideration or circumstance” exists and that the indictment should be dismissed, however, only in the most exceptional circumstances. (People v Harmon, 181 AD2d 34, 35 [1st Dept 1992]; People v Dunlap, 216 AD2d 215, 217 [1st Dept 1995]; People v Guzman, 168 AD2d 154 [2d Dept 1991]; see also People v Beige, 41 NY2d 60, 62-63 [1976] [Fuchsberg, J., concurring] [court should exercise its discretion “sparingly” and only in that “rare” and “unusual” case where it “cries out for fundamental justice beyond the confines of conventional considerations”].) In this case, after considering all the enumerated statutory factors, the court finds that dismissal of the indictment in the interest of justice is not appropriate.
Preliminarily, because the grand jury found that the defendant obtained payment on the vouchers he submitted with knowledge that each falsely stated that he had incurred expenses relating to his trips to and from Albany, it necessarily rejected his claim that he was not on notice that he was not entitled to reimbursement for those expenses.
The defendant points to the nature of the crimes charged, noting that they are not violent in nature, and that the financial loss alleged is minimal. He points out also that neither the State nor the KCDC has complained of the defendant’s conduct, and argues that the crime is thus victimless. Even victimless crimes may be significant, however, and should not be so casually minimized. (See People v Keller, 176 Misc 2d 466, 474 [Sup Ct, NY County 1998] [“While defendant (accused of promoting prostitution in the third degree) argues that the crimes charged are petty and essentially victimless, in fact, to the extent guilt is proved, defendants knew that the activity was illegal, and *352 deliberately chose to pursue it on a large scale for enormous profits”].) In any case, this crime does have a victim, the State of New York, which, as a governmental entity, must rely, sometimes in vain, on others to complain on its behalf. Moreover, whether the victim has spoken loudly or not, when a defendant is charged with crimes of duplicity and deception, dismissal may well be inappropriate. (See People v Osier, 258 AJD2d 881 [4th Dept 1999] [dismissal in interest of justice unwarranted where defendant charged with larceny by false pretenses].)
Admittedly, the loss to the State alleged is not great, but neither is it so insubstantial, particularly given that the Legislature has determined that the theft of such an amount should be chargeable as a class D felony. In any case, the gravity of the offenses charged and the harm they allegedly produced lie not so much in the monetary amount allegedly stolen, but in the impairment of public trust. “Surely a crime becomes no less a crime when performed by a public officer and may well be considered by some to be worse.” (People v Belkota, 50 AD2d 118, 122 [4th Dept 1975].) Accordingly, the nature of the crimes charged militate against, rather than in favor of, dismissal. (CPL 210.40 [1] [a], [b].)
The defendant also asserts that there is no evidence of his intent to commit larceny or of his knowledge that the statements he made in the vouchers were false. Thus, he contends, there is no evidence of his guilt. In support of this contention, beyond pointing to what he assumes to be the evidence before the grand jury, the defendant has submitted an affidavit from William Collins, who, as noted above, is Counsel to the Assembly Majority, was a witness before the grand jury, and who, when asked “if an assemblyman did not have to pay for a personal vehicle or pay the expenses of a personal vehicle, would he be entitled to reimbursement for those expenses?,” replied that reimbursement under those circumstances “would not be consistent with the applicable law, § 5 subdivision two of the Legislative Law or the regulations that govern.” In his affidavit, Mr. Collins now states that he has been advised that the vehicle the defendant drove to and from Albany was registered to and insured by the defendant, and that the defendant held title to it.[15] Mr. Collins avers that “[s]uch indicia of ‘ownership’ are suf *353 ficient support for the conclusion that [the defendant] was driving his ‘personally-owned vehicle’ to and from Albany during the referenced time period.” Relying on this information, and on his conclusion from it, he states that “[g]iven the sparse language and guidance of the instructions . . . and the reference to both the per diem allowance and the mileage rate as ‘expenses,’ it may reasonably be asserted that such vouchers do not contain a ‘false statement’ or ‘false’ information.”[16] Whether Mr. Collins will testify at trial; whether he will be asked a third time for his opinion concerning these matters; what factual *354 basis he will be asked to base his opinion on; whether his opinion, if offered, will be accepted by the jury; and what affect his prior affidavit or grand jury testimony will have on the jury’s decision, should the jury learn of either, all remain to be seen. For now, all that can be said is that his affidavit fails to cast so much doubt on the defendant’s guilt, or on the likelihood of his conviction, as to require dismissal of the indictment without trial. Accordingly, the evidence in the case is not a significant factor in favor of dismissal. (CPL 210.40 [1] [c].)
The defendant also points to his history, character and achievements as a basis for dismissal under CPL 210.40 (1) (d). The defendant, while undoubtedly a man of accomplishment, is accused of having abused the trust placed in him by the public, not only in this indictment, but in the others returned against him. Under such circumstances, his position, his awards, and his contributions to his constituents cannot justify dismissal of these charges. (See People v Kelley, 141 AD2d 764, 765 [2d Dept 1988] [“The mere fact that the defendant may be a police officer ... or has an exemplary background ... is insufficient to justify the exercise of the court’s discretion” to dismiss an indictment charging the defendant with DUI (citations omitted)]; People v Varela, 106 AD2d 339, 340 [1st Dept 1984] [dismissal in interest of justice not warranted based on defendant’s “ ‘exemplary’ background at work, in the Air Force, as a father and as a civic affairs volunteer”]; People v Belkota, supra [court abused discretion when it dismissed indictment in interest of justice based upon, inter alia, defendant’s extraordinary record as police officer].)
Although the defendant alleges that in bringing this case against him, the District Attorney of Kings County has acted outside of his geographical jurisdiction, and is employing what he purports is a novel and erroneous theory of law — allegations which this court has now rejected — the defendant does not allege that either the People or the police have engaged in any misconduct in the investigation and prosecution. Thus, this factor does not compel dismissal on the ground of unfairness to the defendant. (CPL 210.40 [1] [e]; compare People v McDougal, 221 AD2d 374, 375 [2d Dept 1995] [police in conducting sting operation targeting defendant police officer did not engage in crime or improper activity “repugnant to a sense of justice”], with People v Isaacson, 44 NY2d 511, 518-519 [1978] [in cases where the police conduct is “tested by due process standards” and found to be “so egregious and deprivative,” the court has “an *355 obligation to dismiss”].) To the contrary, the prosecution of a public official for allegedly larcenous conduct can serve an important purpose as a reminder that no one is above the law (CPL 210.40 [1] [f]), and dismissal of the indictment under these circumstances would seriously undermine “the confidence of the public in the criminal justice system.” (CPL 210.40 [1] [g].) This is particularly so, given the fact that the defendant remains in his official and party positions, from which conduct such as that charged in this indictment and in the others against him, if proven to have occurred and to be criminal, could be repeated. (CPL 210.40 [1] [h].) Finally, the defendant has failed to present “any other relevant fact indicating that a judgment of conviction would serve no useful purpose.” (CPL 210.40 [1] Q].)
In sum, there is no “compelling factor, consideration or circumstance clearly demonstrating that conviction or prosecution of the defendant upon [the] indictment . . . would constitute or result in injustice” (CPL 210.40 [1]), and the defendant’s motion to dismiss on this ground is denied.
Discovery and Bill of Particulars
The defendant moves for an order directing the People to respond to his demands for a bill of particulars and for discovery. The People have adequately responded to the defendant’s demands in their answer and, at the request of the court, at oral argument of this motion.[17] If, however, the defendant believes that there is some discovery to which he is entitled under CPL 240.20 and which the People have failed to provide, he may renew this motion at a later date.
Prior to trial, the People are to inform the defendant and the trial court what, if any, uncharged criminal, vicious or immoral conduct they will seek to introduce into evidence for a determination of its admissibility. A Sandoval and/or Ventimiglia hearing will be conducted immediately prior to trial.
The People are reminded of their continuing obligation to disclose to the defendant any exculpatory evidence in their possession pursuant to Brady v Maryland (373 US 83 [1963]), and its *356 progeny, and that they are obligated to provide it to the defendant, if it exists, in a timely manner.

. The evidence presented in the grand jury established that over the period of time set forth in the indictment, three different vehicles, 1998, 2000, and 2002 Lincoln Town Cars, were registered with the Department of Motor Vehicles in the defendant’s name, one after the other and none at the same time. However, the registration for the 1998 Lincoln Town Car, while in the defendant’s name, listed his address as 16 Court Street, Brooklyn, New York, the address of the KCDC, as did the insurance identification card issued for the 2000 Lincoln Town Car. The other documents listed the defendant as the registrant at another address in Brooklyn, New York.

. The mileage allowance, set by the Assembly Speaker, was the federal reimbursement rate. Since 1999, that allowance has risen from 31V20 per mile to 36V20 per mile.

. Contrary to the defendant’s suggestion, offered in the affirmation submitted by his attorney in support of his omnibus motion, the mileage allowance is in no way based on the time and physical effort involved in driving.

. See also New York Constitution, article III, § 6, which provides, in pertinent part, that “[e]ach member of the legislature . . . shall ... be reimbursed for his or her actual traveling expenses in going to and returning from the place in which the legislature meets, not more than once each week while the legislature is in session . . . .”

. In support of his omnibus motions, the defendant has offered an affidavit from Mr. Collins in which Mr. Collins states, in essence, that, having been informed that the car the defendant drove was registered to him, that he held title to it, and that he paid to insure it, it is now Mr. Collins’ opinion that the defendant may have been entitled to the mileage allowance. While that affidavit may have relevance in other contexts, it does not affect the sufficiency of the evidence before the grand jury, including Mr. Collins’ testimony before that body.

. While the order of events the defendant describes is generally correct, there were at least four occasions when, according to the grand jury evidence, the defendant purchased gas in Brooklyn on the same day he drove to Albany, and the American Express bill including that charge was paid before or on the same day the defendant signed the certification for the voucher seeking a mileage allowance for that trip. In connection with the voucher that is the subject of count 17, the defendant charged a purchase of gas to the American Express card in Brooklyn on April 16, 2000, and drove to Albany that day. The American Express bill, including that charge, was paid by check dated May 15, 2001, and the defendant signed the certification for the voucher that sought mileage for that trip on June 19, 2001. In connection with the voucher that is the subject of count 19, the defendant charged a purchase of gas in Brooklyn on May 14, 2000, and drove to Albany that day. The American Express bill, including that charge, was paid by check dated June 26, 2000, and the defendant signed the certification for the voucher that sought mileage for that trip on July 20, 2000. In connection with the voucher that is the subject of count 29, the defendant charged a purchase of gas in Brooklyn on December 17, 2000, and drove to Albany that day. The American Express bill, including that charge, was paid by check dated January 12, 2001, and the defendant signed the certification for the voucher that sought mileage for that trip to Albany on January 19, 2001. In connection with the voucher that is the subject of count 76, the defendant charged a purchase of gas in Brooklyn on October 20, 2002, and drove to Albany that day. The American Express bill, including that charge, was paid by check dated November 18, 2002, and the defendant signed the certification for the voucher that sought mileage for that trip to Albany on November 18, 2002.

. In any case, two representatives of the State, William F. Collins, Counsel to the Assembly Majority, and Linda Stewart, Chief Auditor of State Expenditures for the New York State Comptroller’s Office, did, in fact, appear before the grand jury, and each offered testimony that contributed to the grand jury’s conclusion that the defendant improperly sought reimbursement for travel expenses that he did not, in fact, incur.

. Specifically, Mr. Collins testified, in pertinent part, as follows:
“q. Let me ask you this: If the Assembly member were to receive payment for these expenses from another source, would he have incurred the expenses as so stated in the voucher?
“a. It doesn’t appear as if the expenses would have been incurred if it wasn’t incurred; that seems totally illogical. . .
“q. Just to be clear . . . I’m talking about another party paying for the expense to Albany not being incurred by the Assembly person, would he be entitled to that expense for reimbursement for that expense if, in fact, he had not been paid for it? Would he be entitled to it?
“a. That would not be my reading of the law that he would be entitled to it
“q. Mr. Collins, just one final question ... I just want to make it clear for the grand jury, does an assemblyman have permission and authority to submit expenses for reimbursement which were not in fact incurred? In other words, if an assemblyman did not have to pay for a personal vehicle or pay the expenses of a personal vehicle, would he be entitled to reimbursement for those expenses?
“a. My understanding, that that would not be consistent with the applicable law, § 5 subdivision two of the Legislative Law or the regulations that govern.
“q. Okay. And again, to clarify the record for now, I’m referring to the per diem expense vouchers that are submitted.
“a. Yes.”

. That presentation resulted in the grand jury returning indictment No. 5588/2003, which charges the defendant with crimes unrelated to those charged in this matter.

. The period of time set forth in the grand larceny count, “on or about and between May 27, 1999 and November 29, 2002,” begins on the day the second count alleges the earliest of the vouchers included in the false filing charges was submitted, and it ends on the date the grand jury evidence demonstrates that payment was made on the latest of the vouchers included in the false filing charges, which is the subject of the 77th count.

. When reviewing the adequacy of the instructions given to a trial jury, which must be charged with a greater “degree of precision” (see People v Cal-bud, Inc., 49 NY2d 389, 394 [1980]), the analysis would, of course, be different. (See People v Ribowsky, 77 NY2d at 292 [when defendant challenges geographical jurisdiction at trial, jury must be instructed on question, and, while failure to do so is subject to harmless error analysis, “(i)t is not enough that the record contains evidence of (a jurisdictional basis) in that county — it must appear from the instructions or by necessary implication from the verdicts that the jury made a finding of proper venue”].)

. Note that while CPL 20.40 (4) (k) is particularly directed to the crimes charged here, this provision “does not divest a county of geographical jurisdiction it possesses under any other subdivision of CPL 20.40.” (Matter of Sharp-ton v Turner, 169 AD2d at 949; see also Preiser, supra at 134 [“the fact that a particular situation is expressly covered by one of the paragraphs of subdivision 4 does not negate jurisdiction granted in one of the more general provision of the other three subdivisions”].) Thus, as already indicated, jurisdiction over the crimes charged in this indictment is invested in Kings County by CPL 20.40 (1) (a), independently of subdivision (4) (k) and despite the fact that its provisions are more specifically directed to those crimes.

. According to the evidence before the grand jury, the defendant charged gas or maintenance services in Kings County on the same day he traveled to Albany on dates reflected in the vouchers that are the subject of counts 1-4, 6-8, 10, 15, 17-19, 24, 27, 29, 34, 38, 40, 42, 44-45, 47, 55, 59-60, 62, 64, 72-74 and 76. According to the grand jury evidence, the defendant also charged gas or maintenance services in Kings County on the day before he traveled to Albany on dates reflected in the vouchers that are the subject of counts 9, 16, 20, 30, 33, 35-36, 39, 41, 50, 54, 66, 70 and 75. Finally, according to the grand jury evidence, the defendant charged gas or maintenance services in Kings County on the day after he returned from Albany on a date reflected in the voucher that is the subject of count 13. The grand larceny count, of course, relates to travel on all these occasions.

. In addition, and aside from questioning whether Kings County has geographical jurisdiction over the offenses charged in this indictment, the defendant contends that the Kings County District Attorney has no standing to prosecute this case. However, contrary to the defendant’s contentions, public officers and officials are not per se immune to grand jury inquiry or formal *347 prosecution, and the Constitution and statutory law clearly permit a district attorney and grand jury with geographical jurisdiction to inquire into the legality of the acts of such public servants. (See NY Const, art I, § 6; CPL 190.55 [2] [a], [e]; 190.05.) Accordingly, the Kings County District Attorney may bring this case against the defendant.

. There was no evidence before the grand jury concerning payment of the insurance on the cars. There was also no evidence before the grand jury *353 indicating that the defendant held title to the cars, which the KCDC leased for his use, and it seems unlikely that title on a leased car would be held by the lessee, rather than the lessor. In any case, section 2101 (g) of the Vehicle and Traffic Law provides that an “owner” of a vehicle “means a person, other than a lienholder, having the property in or title to a vehicle,” and further specifies that “[t]he term includes a person entitled to the use and possession of a vehicle subject to a security interest in another person, but excludes a lessee under a lease not intended as security.” Moreover, title is not necessarily determinative of ownership. The Second Department has repeatedly held that “[a] certificate of title is prima facie evidence of ownership, but it is not conclusive proof of ownership and it may be rebutted . . ..” (Vergari v Kraisky, 120 AD2d 739, 739 [2d Dept 1986] [citations omitted].) In Kraisky, the Court held that possessory interest in the vehicle, with “its attendant characteristics of dominion and control,” rebutted the presumption of ownership raised by the certificate of title. (Id; see also Dallura v Rubicco, 5 AD3d 346 [2d Dept 2004] [following Kraisky]; Dorizas v Island Insulation Corp., 254 AD2d 246 [2d Dept 1998] [same].) In Young v Seckler (74 AD2d 155,157 [2d Dept 1980]), an appeal in an automobile negligence action, the Court expressed its view that, “given the familial setting presented and absent the inference flowing from the insurance policy [which designated the husband as the main insured], mere proof that the husband provided the money for the purchase and maintenance of the car would not have been sufficient to challenge the presumption of ownership [by the wife] raised by the registration.” In Matter of Chesworth v Block (145 AD2d 418, 419 [2d Dept 1988]), an appeal in a forfeiture proceeding pursuant to Public Health Law § 3388, the Court held that “[t]he question of whether David Block’s use of the vehicle and his admission to the undercover police officer that he had purchased the vehicle establishes his ownership in rebuttal of the title certificate must be resolved by the trier of fact,” and ordered that a hearing be held on the issue.

. Mr. Collins also states in his affidavit that he “would be unable to conclude that [the defendant] knew that, under the circumstance of [his] operation of a personally-owned vehicle, the vouchers contained a false statement or false information when he submitted them to the Assembly.” Even with his familiarity with the laws relating to and procedures for reimbursement of traveling expenses of Assembly Members, Mr. Collins could not properly offer an opinion concerning the defendant’s state of mind, one way or the other, since, as noted earlier, such an opinion would “not involve professional knowledge outside the range of ordinary training or intelligence” and jurors are “fully capable of comprehending the issues and evaluating the evidence as it related to the defendant’s intent.” (.People v Robinson, 191 AD2d at 596-597 [2d Dept 1993].)

. In addition to the earlier described addendum to their bill of particulars concerning “the false statement or information” in each of the vouchers, the People also stated explicitly during oral argument (as they had not in their written submissions) that they were in possession of no Brady material.