OPINION OF THE COURT
Meyer, J.
The issue to be determined in the trial of a witness for perjury is whether, measured by the meaning of the words used in the context of the questions asked and answers given, defendant’s testimony was intentionally false. When that context contains nothing to suggest that the word “firearm” was used in the limited sense defined in subdivision 3 of section 265.00 of the Penal Law, and shows that “firearm” was used interchangeably with “weapon” and to include a tranquilizer gun, it is a question for the jury whether proof that defendant fired a .22 caliber rifle and a pellet gun establishes the falsity of his testimony that he “never discharged a firearm.” The order of the Appellate Division affirming defendant’s perjury conviction should, therefore, be affirmed.
Defendant Neumann was the Acting Supervisor of the Prospect Park Zoo in Brooklyn, and the perjury charges against him stem from his testimony at a 1976 hearing of the New York City Department of Investigation concerning practices at the zoo. The Department of Investigation had received reports from the Parks Department that animals .had been abused and killed by zoo employees. One report alleged that a monkey had been scalded to death.
Before calling defendant to testify, Investigator Roche obtained sworn statements from defendant’s subordinates at the zoo. A menagerie keeper at the zoo, Devillo Holmes, swore that he and another zoo employee had accompanied defendant to the “elephant house” where all three men shot at pigeons with an air-powered pellet gun. Ejnar Johnson, *662 a porter at the zoo, also reported that he had observed the defendant shooting at pigeons in the elephant house. Samuel Borrelli swore that he had seen defendant shoot a .22 caliber rifle at rats in the lion house and Devillo Holmes corroborated that fact.
Having secured these sworn statements, Investigator Roche summoned defendant for examination. Roche asked first whether there were wild birds within the zoo and defendant stated that there were, mainly starlings and pigeons. Asked if steps had been taken to drive the birds out, defendant answered that employees would either make loud noises or spray water at the birds. The following colloquy then ensued:
“Q. Has there been any other means used to your knowledge?
“A. Not to my knowledge.
* * *
“Q. Have you ever used a firearm to disperse the pigeons?
“A. I have not.
“Q. Do you own any firearmsl
“A. I do.
“Q. Could you tell me what kinds they are?
“A. 306, very powerful gun much too big for pigeons.
“Q. Do you own any other firearmsl
“A. Well, I have some in my summer home in Maine, but they are not registered. Also I have a New York City pistol permit.
“Q. For what kinds of weapons!
* * *
“A. .357 Magnum.
“Q. Do you own any other weapons at home in New York?
“A. I have a 12 gauge shotgun.
“Q. Have you ever registered any weapons with the City of New York?
“A. All my weapons are registered.
* * *
“Q. Are there any others [ , ] those that you haven’t mentioned?
*663 “A. No.
“Q. You own a .221
“A. I do not.
“Q. Do you own a pellet gunl
“A. I do not.
“Q. Does the zoo own a pellet gunl
“A. Not to my knowledge.
* * *
“Q. And you say you’ve never discharged a weapon or firearm at any of the pigeons or birds at the zoo?
“A. Correct.
“Q. Have you ever seen anybody do that?
“A. No.” (Emphasis supplied.)
Investigator Roche then led the discussion to other topics, such as defendant’s relationship with his subordinates and the treatment of animals at the zoo. However, he returned to the subject of whether defendant had discharged a firearm at pigeons or within the confines of the zoo. The inquiry proceeded as follows:
“Q. I’d like to go back to one other area we discussed and that is the pigeons. Have you ever, at any time, discharged" a firearm at any of the pigeons?
“A. No.
“Q. Has any employees of the zoo?
“A. Not to my knowledge.
“Q. Did you ever discharge a firearm anywhere within the geographical confines of the zoo?
“A. No.
“Q. Are you certain of that?
“A. I don’t ever recall doing it. Unless — well, the tranquilizer gunl
“Q. Other than the tranquilizer gun?
“A. No.
“Q. And you’re absolutely certain you never discharged a firearm in the Elephant House at the-pigeons?
“A. Certain.
*664 “Q. Have you owned a .22 in the last year?
“A. No.
“Q. Have you used a .22 in the last year?
“A. I spend a great deal of time in Pennsylvania where I use a great many firearms and I probably have.
* * *
“Q. Have you used a pellet gun in the last year?
“A. I don’t recall using one in the last — many many years before that.
, * * *
“Q. Have you never seen any dead pigeons in the zoo killed by bullets?
“A. Not that I know.” (Emphasis supplied.)
When the inquiry ended, Roche expressed his belief that defendant had not testified truthfully and reminded him of the penalty for giving false testimony. Roche also in- - formed defendant that he could then recant his testimony without penalty, but defendant did not accept the offer.
The indictment contains two counts. The first charges that defendant “swore falsely that he never discharged a firearm at any of the pigeons or birds at the zoo”, and the second accuses defendant of having sworn “falsely that he never discharged a firearm within the geographical confines of the zoo.” Holmes, Johnson and Borrelli having testified at trial concerning defendant’s shooting an air-powered pellet gun at pigeons in the elephant house and firing a rifle at rats in the lion house, the Trial Judge submitted both counts to the jury under instruction that they must determine what defendant meant when he denied discharging a firearm. Defendant was convicted of both counts of perjury and the Appellate Division, by a divided court, affirmed.
Defendant presents a number of arguments for reversal, only one of which, the standard by which falsity is to be determined, requires discussion. Defendant urges that his responses were literally true, becáuse the Penal Law definition of “firearm” as “any pistol, revolver, sawed-off shotgun or other firearm of a size which may be concealed upon *665 the person” (§ 265.00, subd 3) does not include either a .22 rifle or a pellet gun. Alternatively, he insists that his conviction on the first count must be reversed because the dictionary definition of “firearm” (“a weapon from which a shot is discharged by gunpowder”, Webster’s Third New International Dictionary, at p 854) excludes an air-powered pellet gun. Though the discourse between a witness and his interrogator could make either or both definitions relevant, this is not such a case.
Nothing in the interchange between defendant and Roche suggested that either was speaking with reference to the Penal Law definition of “firearm”. More importantly, that definition itself contains its own refutation that it was intended to have any bearing on the determination of a perjury indictment such as the present one. This is because the definitions in section 265.00 of the Penal Law are preceded by the limiting words: “As used in this article and in article four hundred, the following terms shall mean and include”. Article 265 is concerned with possession, use and purchase of firearms and other dangerous weapons. Article 400 deals with the licensing of firearms and the destruction of weapons. Because neither is related in any way to a prosecution for perjury, section 265,00 by its express language precludes reliance upon its firearm definition in such a prosecution, except as a question or answer may have been specifically addressed to that definition.
More difficult is the question whether the first count must fall because the dictionary definition of “firearm” excludes an air-powered weapon. Defendant’s argument is largely based upon the decision of the United States Supreme Court in Bronston v United States (409 US 352). The Supreme Court did emphasize in that case that “The burden is on the questioner to pin the witness down to the specific object of the questioner’s inquiry” (at p 360), and that “Precise questioning is imperative as predicate for the offense of perjury” (at p 362). Those statements can no more be applied out of context, however, than can defendant’s words be assayed for falsity out of the context in which they were spoken.
In Bronston (at p 354) defendant had answered in the *666 negative the question whether he had any bank accounts in Swiss banks. To the next question: “Have you ever?” his answer was: “The company had an account there for about six months, in Zurich.” The answer was literally true, but did not reveal that Bronston had himself maintained a Swiss bank account in the past although he did not have such an account at the time he was questioned. The Supreme Court held that the Federal perjury statute did not reach a nonresponsive answer which, so far as it went, was literally true. Reviewing the history of the offense of perjury, including the seminal Report on Perjury made in 1935 by our Law Revision Commission (NY Legis Doc, 1935, No. 60), the court concluded that the Congress did not intend its perjury statute to be construed so broadly. Of major concern as that history revealed was that witnesses not be discouraged from testifying by the fear that their responsibility for misunderstanding would be tested by jury hindsight and against the vague standard “of 'intent to mislead’ or ‘perjury by implication’ ” (id., at p 359). The safeguard, the court concluded, was to require that a perjury charge be based on actual rather than implied falsehood, leaving it to a “probing, prying, pressing” cross-examination rather than the threat of a perjury prosecution to ferret out the truth.
Bronston’s insistence upon thorough cross-examination was, thus, addressed to an answer literally true but unresponsive to the question because a half-truth. Here we deal with a witness who insists that he spoke truthfully because the word “firearm” had a different meaning for him than it did for his questioner. Whether words are spoken falsely, however, is not wholly a subjective matter. Unlike Humpty-Dumpty, the perjury defendant will not be heard to say “When I use a word it means just what I choose it to mean — neither more nor less.” Rather is the meaning to be gleaned from the context in which the word is used.
The English language contains many words with multiple meanings. As Mr. Justice Holmes so beautifully phrased it in Towne v Eisner (245 US 418, 425), “A word is not a crystal, transparent and unchanged, it is the *667 skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used.” It will, therefore, ordinarily be for the jury, when a perjury defendant claims that his answers to questions asked were truthful because he ascribed a particular meaning to a word, to determine from the context in which the word was used whether the claim is valid.
The conclusion reached is not new to perjury law. Thus, in Seymour v United States (77 F2d 577, 584), the Sixth Circuit held it a jury question whether a perjury defendant thought the question put to him “meant what he said he understood it to mean,” and in Meyers v United States (171 F2d 800, cert den 336 US 912) and United States v Bonacorsa (528 F2d 1218, cert den 426 US 935), the District of Columbia Circuit and the Second Circuit Courts of Appeals have both concluded that “[a] defense to a charge of perjury may not be established by isolating a statement from context, giving it in this manner a meaning entirely different from that which it has when the testimony is considered as a whole” (528 F2d, at p 1221).
Viewed in the context in which defendant responded to questioning by Roche, no other conclusion can be reached than that there was evidence to take to the jury the question whether defendant testified falsely when he swore that he never discharged a firearm at pigeons or birds at the zoo or within the geographical confines of the zoo. The concept that defendant used the word “firearm” in its Penal Law sense is, if not negated, placed in serious doubt by the interchangeable use of “weapon” and “firearm” in the course of the questioning and by the references to a tranquilizer gun, to a pellet gun, and to a .22 caliber rifle, the more so as to the last since defendant himself used the word “firearm” when asked if he had used a .22 in the last year. The suggestion that defendant used the word “firearm” in its dictionary sense to mean a gunpowder, as distinct from an air-powered, weapon, while not as clearly so, also presented a question for the jury. Asked if he was certain that he had never discharged a firearm within the confines of the zoo, defendant responded, “I don’t ever recall doing it. Unless — well, the tranquilizer *668 gun.” Defendant never questioned the use of the term “firearm” during his examination, or even after Investigator Roche had told him that he believed defendant had lied. Nor did he ever ask that the Trial Judge charge the jury as to the definition of firearm for which he now presses. There was ample evidence from which a jury could conclude that defendant used the term “firearm” in a sense broad enough to include both a .22 caliber rifle and an air-powered pellet gun and was not confused by the Penal Law or dictionary definition of the term. That being so, defendant’s conviction should be affirmed.