[821 NE2d 942, 788 NYS2d 638]

The People of the State of New York, Respondent, v Simeon Duggins, Appellant.

Argued October 14, 2004; decided December 2, 2004

## POINTS OF COUNSEL

*Warren S. Landau,* New York City, and *Lynn W.L. Fahey* for appellant. I. The evidence was insufficient to establish that appellant killed Wayne Flowers "as part of the same criminal transaction" in which he killed Franklin Dennis in a different location an hour and a half later, and the court erred in importing the broad definition of a "criminal transaction" contained in CPL 40.10 (2) for double jeopardy purposes into the first-degree murder statute when it defined that crime under Penal Law § 125.27 (1) (a) (viii) for the jury. (*Jackson v Virginia,* 443 US 307; *People v Fernandez,* 173 Misc 2d 938; *People v Finnegan,* 85 NY2d 53; *People v Walker,* 81 NY2d 661; *Pajak v Pajak,* 56 NY2d 394; *Segar v Youngs,* 45 NY2d 568; *People v McNamara,* 78 NY2d 626; *People v Neumann,* 51 NY2d 658; *People v Powell,* 54 NY2d 524; *People v Hernandez,* 98 NY2d 8.) II. When the People relied almost exclusively on appellant's confessions, which he testified were involuntary, the trial court's error in revising its *Sandoval* ruling to permit inquiry about appellant's prior violent crime was harmful because the evidence of guilt was far from overwhelming when properly assessed "without reference to the error" and, in any event, there was a significant probability of acquittal but for the error. (*People v Sandoval,* 34 NY2d 371; *People v Fardan,* 82 NY2d 638; *People v Cooper,* 92 NY2d 968; *People v Morgan,* 171 AD2d 698; *People v Melendez,* 55 NY2d 445; *People v Moore,* 92 NY2d 823; *Richardson v Marsh,* 481 US 200; *People v Moore,* 71 NY2d 684; *People v Lugo,* 218 AD2d 711; *People v Rojas,* 97 NY2d 32.)

*Charles J. Hynes, District Attorney,* Brooklyn (*Victor Barall* and *Leonard Joblove* of counsel), for respondent. I. Defendant's contention that, under a correct definition of the term "criminal transaction," the evidence was legally insufficient to sustain his first-degree murder conviction is without merit. The CPL 40.10 definition of "criminal transaction" applied to Penal Law § 125.27 (1) (a) (viii), and under that definition, the evidence of defendant's guilt was legally sufficient. (*People v Reed,* 265 AD2d 56; *Matter of Alonzo M. v New York City Dept. of Probation,* 72 NY2d 662; *Matter of SIN, Inc. v Department of Fin.,* 71 NY2d 616; *People v Cruz,* 48 NY2d 419; *People v McNamara,* 78 NY2d 626; *People v Fernandez,* 173 Misc 2d 938; *People v Mateo,* 93 NY2d 327; *Matter of Moran Towing & Transp. Co. v New York State Tax Commn.,* 72 NY2d 166; *People v Hernandez,* 98 NY2d 175; *People v Cahill,* 2 NY3d 14.) II. The trial court properly modified its *Sandoval* ruling. In any event, if the court erred, the error was harmless because the evidence of defendant's guilt, without reference to the error, was overwhelming, and there is no significant probability that the jury would have acquitted defendant had the court not modified its *Sandoval* ruling. (*People v Smith,* 97 NY2d 324; *People v Hopkins,* 58 NY2d 1079; *People v Lawson,* 293 AD2d 338; *People v Sandoval,* 34 NY2d 371; *People v Fardan,* 82 NY2d 638; *People v Crimmins,* 36 NY2d 230; *People v Gray,* 84 NY2d 709; *People v Smith,* 97 NY2d 324; *People v Hopkins,* 58 NY2d 1079; *People v Schaeffer,* 56 NY2d 448.)

## OPINION OF THE COURT

READ, J.

We hold that the People adduced legally sufficient evidence that defendant committed first-degree murder by killing multiple victims during the "same criminal transaction" (Penal Law § 125.27 [1] [a] [viii]). In affirming defendant's conviction, we conclude that the statutory term of art "criminal transaction" in Penal Law § 125.27 (1) (a) (viii) should be construed as incorporating the technical definition given the phrase in CPL 40.10 (2).[1]

---

1. Penal Law § 125.27 (1) (a) (viii) provides that "[a] person is guilty of murder in the first degree when . . . [w]ith intent to cause the death of another person, he causes the death of such person or of a third person; and . . . as part of the same criminal transaction, the defendant, with intent to cause serious physical injury to or the death of an additional person or persons, causes the death of an additional person or persons." A "criminal transac-

## I.

Defendant killed two people in a 90-minute time span. The first killing occurred about 1:40 A.M. on July 4, 1999, and the second took place nearby at roughly 3:10 A.M. The evidence against defendant consisted of statements and confessions that he made after being arrested; specifically, one that the police reduced to writing, which defendant signed, and another in a 50-minute videotaped interview conducted by an assistant district attorney. Additionally, the People presented several witnesses at trial who corroborated details of defendant's confessions.

Defendant, who acknowledged being friendly with members of the "Bloods," fatally shot his two victims, who he claimed were members of the "Crips," because he believed that they were prepared to carry out a contract to kill him. The two homicides occurred within a relatively small area of a housing project where defendant had lived until two weeks beforehand. He moved away after a conflict with someone named "Snag." Defendant subsequently learned that Snag, who had abandoned the Bloods to become a Crip, had issued an order or contract, called a "187" in gang parlance, directing any member of the Crips to kill him. Armed with a .38 caliber snub-nosed handgun, defendant returned to the housing project on July 3, 1999 to "squash" this contract on his life. As defendant put it, he intended to "catch[ ]" Snag.

Initially, defendant encountered a man known to him as "Callie" standing with another man. According to defendant, these men, like Snag, belonged to the Crips, and were "hench[es]" who could carry out the hit. When defendant tried to talk to the two men, they said nothing. He then entered a building in the housing project to visit a friend. From a window, defendant observed Callie and his companion, now standing with a third man. Fearing that the three men were armed and on the lookout for him, defendant and his unarmed friend decamped to the building's roof, where defendant remained for nearly four hours.

Despite his professed fear for his life, defendant eventually left the roof—now alone, but still armed—and went to a fast-

---

tion" is defined in CPL 40.10 (2) as "conduct which establishes at least one offense, and which is comprised of two or more or a group of acts either (a) so closely related and connected in point of time and circumstance of commission as to constitute a single criminal incident, or (b) so closely related in criminal purpose or objective as to constitute elements or integral parts of a single criminal venture."

food restaurant outside the housing project. After eating, he returned and observed Callie standing with four men, none of whom he knew to be Crips. Believing that Callie would no longer be armed, defendant decided to confront him regarding the contract. They argued. Backing away, defendant drew his gun and fired three shots at Callie, fatally wounding him in the head. In his videotaped confession, defendant said that he intended only to hurt, not kill, Callie.

As defendant ran away after shooting Callie, he realized that as a result of what he had just done, Snag would now surely want him dead. He circled back to the roof, a vantage point from which to look out for Snag, "the dude [he] had the main beef with," and watched as police officers placed crime scene tape near Callie's body. Defendant saw Snag approach the crime scene on a bike "to see what happened to . . . his gang members," then leave. Defendant reloaded his gun. As he explained, "I went this far [so] I better go on with it or . . . I'm gonna wind up dead."

When defendant next spied Snag, standing on the sidewalk below and smoking marijuana, he climbed down a fire escape from the roof to street level and crept towards him. With his gun at the ready, defendant ducked behind a wall on which Snag's male and two female companions were sitting. Then defendant called out, causing Snag to turn. Although he saw no weapon in Snag's hands, defendant fired three shots, inflicting a fatal chest wound.[2] Again, defendant claimed that he wanted his victim to "feel it," but not to die.

Following the second killing, defendant hid in a vacant apartment in the housing project; he left the following day, disguised in women's clothing. The police arrested him approximately $2^1/_2$ weeks later.[3]

---

**2.** In his confessions, defendant identified his friend Marcus as Snag's male companion. Marcus testified for the People, corroborating defendant's statement that Marcus had, indeed, been present when Snag was shot. According to Marcus, Snag uttered an expletive, which caused Marcus to turn and look in the same direction as Snag. When he did so, Marcus saw a "flash" and heard gunshots. He observed defendant near the flash, about 12 to 13 feet away from Snag.

**3.** Defendant testified at trial, claiming that he had invented his confessions under duress, and had not even been present at the housing project on the day of the murders. For example, defendant stated in his confessions that he hid in a vacant apartment with his friend "Snoop" after the shootings. While there, he phoned "Fife," from whom he had borrowed the murder

Defendant stood trial on two counts of first-degree "same transaction" murder (Penal Law § 125.27 [1] [a] [viii]). The first count charged defendant with intentionally killing Callie, and then, as part of the same criminal transaction and with intent either to kill or cause serious physical injury, causing Snag's death; the second count reversed the order of the victims, listing Snag as the primary one. At the close of trial, the judge submitted both counts to the jury. Rejecting defendant's request to define "criminal transaction" by reference to dictionary definitions, the trial court instead supplied the definition in CPL 40.10 (2). The jury convicted defendant of intentionally killing Snag (the second count), and acquitted him of the other count. The jury did not consider any lesser-included offenses because the trial judge had instructed the jurors to do so only if they acquitted defendant on both first-degree murder counts.

A divided Appellate Division affirmed defendant's judgment of conviction (1 AD3d 450 [2d Dept 2003]), and a dissenting Justice of that Court granted him leave to appeal to us. We now affirm.[4]

## II.

Defendant asserts that the phrase "criminal transaction" in subdivision (1) (a) (viii) of the first-degree murder statute must be understood by its ordinary meaning and not by reference to the definition in CPL 40.10 (2). We disagree. Courts generally ascribe statutory words an "ordinary and usual" meaning only if a statute contains "words of ordinary import" (McKinney's

---

weapon, and arranged for someone to come and pick up the gun from him. As defendant told it in his confessions, a girl named "Sin" ultimately came to the apartment to get the gun, which he had placed in a bag. In his trial testimony, however, defendant claimed to have "made up" Sin. In rebuttal, the People presented a witness named Cindy Jean. She testified that, around July 4, 1999 (she couldn't recall the exact date), her boyfriend, Fife, sent her to the housing project to pick up a package. When she arrived, Snoop met her, brought her to an apartment and handed her a bag to take to Fife. She remembered having seen defendant in the apartment.

4. Defendant did not raise his current claim concerning the definition of "criminal transaction" in the Appellate Division. The claim is fully amenable to our review, however, because defendant properly preserved it at trial (*see* CPL 470.35 [1] ["Upon an appeal to the court of appeals from an order of an intermediate appellate court affirming a judgment, sentence or order of a criminal court, the court of appeals may consider and determine . . . any question of law involving alleged error or defect in the criminal court proceedings resulting in the original criminal court judgment, sentence or order, regardless of whether such question was raised, considered or determined upon the appeal to the intermediate appellate court"]).

Cons Laws of NY, Book 1, Statutes § 232, at 392-393). A different rule applies when statutory language has "received a technical or peculiar significance from long habitual construction, or by legislative definition" (*id.* at 393-394).

"Words of technical or special meaning are construed according to their technical sense, in the absence of anything to indicate a contrary legislative intent" (Statutes § 233). Put somewhat differently, when a statute does not define a particular term, it is presumed that the term should "be given its 'precise and well settled legal meaning in the jurisprudence of the state' " (*Matter of Moran Towing & Transp. Co. v New York State Tax Commn.*, 72 NY2d 166, 173 [1988], quoting McKinney's Cons Laws of NY, Book 1, Statutes § 233).

Moreover, "[w]hen terms of art or peculiar phrases are used, it is supposed that the Legislature had in view the subject matter about which such terms or phrases are commonly employed" (McKinney's Cons Laws of NY, Book 1, Statutes § 233, at 397). As a corollary, "[w]here the same word or group of words is used in . . . different statutes, if the acts are similar in intent and character the same meaning may be attached to them" (McKinney's Cons Laws of NY, Book 1, Statutes § 236, at 401-402). Applying these standard rules of statutory construction, we conclude that the trial court properly construed "criminal transaction" in subdivision (1) (a) (viii) of the first-degree murder statute by reference to the definition in CPL 40.10 (2), a conclusion shared by the two intermediate appellate courts of this state which have considered the issue (*see People v Reed,* 265 AD2d 56, 66-67 [2d Dept 2000]; *People v Mower,* 280 AD2d 25, 28 [3d Dept 2001], *affd on other grounds* 97 NY2d 239 [2002]).

It is difficult to imagine a clearer example of "[w]ords of technical or special meaning" (McKinney's Cons Laws of NY, Book 1, Statutes § 233) than the phrase "criminal transaction" as defined in CPL 40.10 (2). This phrase is a legislative term of art, appearing in many statutes in addition to CPL 40.10 and the first-degree murder provision at issue here (*see e.g.* CPL 40.40 [1]; 40.50 [2], [3]; 200.20 [2] [a]; 200.40 [1] [c]; 240.20 [1] [a], [g]; Penal Law § 60.27 [4] [a]; § 70.25 [2-f]; §§ 130.53, 145.05 [1]; §§ 215.15, 215.16, 215.17, 450.10 [4] [c]; § 460.10 [4] [b]; § 470.03 [1], [2]; § 480.00 [7] [b]; *see also* CPLR 1310 [4-b] [b]; ECL 71-4401 [9]; Family Ct Act § 311.6 [2]; Vehicle and Traffic Law § 1690 [1]). Importantly, whatever the meaning of the phrase in these other statutes, nothing in the text or legislative

history of the first-degree murder statute suggests that the Legislature intended for "criminal transaction" to have a meaning different from CPL 40.10 (2) (*see Matter of Moran Towing & Transp. Co. v New York State Tax Commn.*, 72 NY2d at 173; *see also* McKinney's Cons Laws of NY, Book 1, Statutes § 233).

Further, applying the species of dictionary definition proposed by defendant would render the statute vague, something the Legislature surely did not intend for a statute drafted to "narrow" the potential class of intentional murderers exposed to capital punishment (*see People v Harris*, 98 NY2d 452, 476 [2002] [the United States Supreme Court has "recognized that a state's capital sentencing scheme must genuinely narrow the class of persons eligible for the death penalty" (internal quotation marks and citations omitted)]; *see also People v Cahill*, 2 NY3d 14, 68 [2003] ["(T)he Legislature crafted Penal Law § 125.27 (1) (a) to narrow the class of eligible offenders"]). The impracticability of using dictionary definitions is easily shown. By way of example, according to the Random House Unabridged Dictionary (2d ed 1993), to "transact" is to "carry on or conduct (business, negotiations, activities, etc.) to a conclusion or settlement." This definition (suggested by defendant) begs the questions of what kind of "activities" a factfinder should view and how to determine when the "activities" have reached a "conclusion." By contrast, CPL 40.10 (2) defines exactly what criminal conduct, both temporal and motivational, will lead to liability under subdivision (1) (a) (viii) of the first-degree murder statute.

Thus, liability under Penal Law § 125.27 (1) (a) (viii) attaches only to a defendant who commits an intentional murder and "causes the death of [at least one] additional person" (Penal Law § 125.27 [1] [a] [viii]) by engaging in "two or more or a group of acts either . . . so closely related and connected in point of time and circumstance of commission as to constitute a single criminal incident, or . . . so closely related in criminal purpose or objective as to constitute elements or integral parts of a single criminal venture" (CPL 40.10 [2]). Limiting liability to only those intentional killers so situated fulfills the Legislature's narrowing goal (*see People v Cahill*, 2 NY3d at 68).

Defendant makes two arguments to counter the importation of CPL 40.10 (2)'s definition of "criminal transaction" into Penal Law § 125.27 (1) (a) (viii). First, he points out that CPL 40.10 states that "[t]he following definitions are applicable to this article." Citing *People v McNamara* (78 NY2d 626 [1991])

and *People v Neumann* (51 NY2d 658 [1980]), he contends that the definition of "criminal transaction" in CPL 40.10 is, thus, inapplicable to any other statute unless the Legislature expressly provides otherwise. Both *McNamara* and *Neumann*, however, involved attempts to define a particular substantive offense by reference to definitions applicable to another offense aimed at proscribing different conduct (*see People v McNamara*, 78 NY2d at 630 [refusing to apply definitions applicable to article 245 of the Penal Law to article 240 because the former, as contrasted with the latter, "is directed to offenses against 'public sensibilities,' not 'public order,' and proscribes different conduct"]; *People v Neumann*, 51 NY2d at 665 [definition sharing between weapons offenses and perjury offense would not lie "(b)ecause neither (of the weapons offenses) is related in any way to a prosecution for perjury"]). Here, by contrast, we are simply determining that a statutory term of art common to both statutes under consideration should be understood in light of the technical meaning supplied by CPL 40.10 because nothing in Penal Law § 125.27 indicated that the Legislature intended otherwise.

Defendant also argues that, at most, only the "single criminal incident" definition in subdivision (2) (a) of CPL 40.10 should be imported into Penal Law § 125.27 (1) (a) (viii). According to defendant, incorporating the "single criminal venture" definition of subdivision (2) (b) into subdivision (1) (a) (viii) of the first-degree murder statute would render subdivision (1) (a) (xi) of the latter statute superfluous. To support his argument, he asserts that there is no difference between a "group of acts . . . so closely related in criminal purpose or objective as to constitute elements or integral parts of a single criminal venture" (CPL 40.10 [2] [b]) and a "common scheme or plan" as used in Penal Law § 125.27 [1] [a] [xi]. Defendant is wrong.[5]

Initially, there is no basis for incorporating only half of CPL 40.10 (2)'s definition of "criminal transaction" into Penal Law § 125.27 (1) (a) (viii). If the Legislature had intended this result, it would have so stated, as it has both in other sections of the

---

5. Penal Law § 125.27 (1) (a) (xi) provides that "[a] person is guilty of murder in the first degree when . . . [w]ith intent to cause the death of another person, he causes the death of such person or of a third person; and . . . the defendant intentionally caused the death of two or more additional persons within the state in separate criminal transactions within a period of twenty-four months when committed in a similar fashion or pursuant to a common scheme or plan."

Penal Law (*see* Penal Law § 480.00 [7] [b] [for purposes of the criminal forfeiture provisions of the Organized Crime Control Act, defining a "(s)pecified felony offense" as "three or more violations of" certain enumerated felonies, "which violations do not constitute a . . . single criminal transaction, as defined in paragraph (a) of subdivision two of section 40.10 of the criminal procedure law"]), and in other statutes (*see* CPLR 1310 [4-b] [b] [same with regard to civil forfeiture]).

Additionally, the potential superfluity of which defendant complains would exist only if he is correct that a "common scheme or plan" is equivalent to a "single criminal venture." The Legislature, however, has treated these two terms of art as distinct. CPL 200.40 (1), for example, provides for joinder of multiple defendants in a single indictment if either "all the offenses charged are based upon a common scheme or plan; or . . . all the offenses charged are based upon the same criminal transaction as that term is defined in subdivision two of section 40.10" (CPL 200.40 [1] [b], [c]). If the "single criminal venture" portion of CPL 40.10 (2) meant the same as a "common scheme or plan," there would have been no need for the Legislature to differentiate as it did in CPL 200.40 (1). In fact, accepting defendant's argument that a "single criminal venture" as defined in CPL 40.10 (2) is equivalent to a "common scheme or plan" would render CPL 200.40 (1) partially redundant or superfluous, the very result that defendant claims that he seeks to avoid.

The plain language of Penal Law § 125.27 also eliminates any potential superfluity. Subdivision (1) (a) (viii) premises liability on committing multiple homicides during the "same criminal transaction" while subdivision (1) (a) (xi) applies only if the homicides occurred in "separate criminal transactions." A "same" transaction obviously cannot also be a "separate" transaction.

Further, under CPL 40.10 (2), a " '[c]riminal transaction' means conduct . . . comprised of two or more or a group of acts." An "[a]ct" is a "bodily movement" (Penal Law § 15.00 [1]), while "[c]onduct" normally consists simply of "an act or omission and its accompanying mental state" (Penal Law § 15.00 [4]). By definition then, liability under subdivision (1) (a) (viii) is predicated upon committing at least two homicidal acts sharing either the temporal proximity necessary to be a "single criminal incident" under CPL 40.10 (2) (a), or the motivational unity called for in CPL 40.10 (2) (b) so as to "con-

stitute elements or integral parts of a single criminal venture." The latter is what defendant suggests may be indistinguishable from a "common scheme or plan" homicide under Penal Law § 125.27 (1) (a) (xi). What defendant overlooks, however, is that subdivision (1) (a) (viii) contemplates a virtual simultaneity, or at least contemporaneity, between the "two or more or a group of acts" necessary to establish "same transaction" first-degree murder, even acts that are "elements or integral parts of a single criminal venture" (CPL 40.10 [2] [b]). By contrast, subdivision (1) (a) (xi) applies in the absence of contemporaneity.

By way of explanation, the first-degree murder statute provides that "[a] person is guilty of murder in the first degree when . . . [w]ith intent to cause the death of another person, he *causes* the death of such person or of a third person" (Penal Law § 125.27 [1] [emphasis added]). The Legislature's use of the present tense ("causes") carries into subdivision (1) (a) (viii), but not into subdivision (1) (a) (xi).

Specifically, liability under subdivision (viii) attaches solely if, "as part of the same criminal transaction, the defendant, with intent to cause serious physical injury to or the death of an additional person or persons, *causes* the death of an additional person or persons" (Penal Law § 125.27 [1] [a] [viii] [emphasis added]). Thus, as called for by the present tense "causes," any additional homicides must be contemporaneous with the threshold intentional murder. If not, a defendant may simply have committed separate second-degree murders, or perhaps a second-degree murder and first-degree manslaughter (*see People v Cahill*, 2 NY3d at 64 [the first-degree murder "statute begins by declaring that every first degree murder must include an intentional (second degree) murder. An additional aggravating factor—murder 'plus'—raises the crime to murder in the first degree"]).

By contrast, subdivision (1) (a) (xi) speaks in the past tense ("caused"), not the present tense ("causes" as used in subparagraph [viii]). Liability attaches under subparagraph (xi) solely "when . . . [w]ith intent to cause the death of another person, he *causes* the death of such person or of a third person; and . . . the defendant intentionally *caused* the death of two or more additional persons within the state in separate criminal transactions within a period of twenty-four months" (Penal Law § 125.27 [1] [a] [xi] [emphasis added]).

Thus, subdivision (1) (a) (xi) contemplates that the additional homicides necessary to aggravate a threshold intentional second-

degree murder to first-degree murder (see *People v Cahill*, 2 NY3d at 64) will have occurred in the past. Aggravation occurs under subdivision (1) (a) (viii), however, only if the additional homicides are sufficiently contemporaneous with the threshold intentional murder. There is consequently no danger of conflating "separate criminal transactions . . . common scheme or plan" murder under Penal Law § 125.27 (1) (a) (xi) with "single criminal venture" (CPL 40.10 [2] [b]) "same criminal transaction" murder under Penal Law § 125.27 (1) (a) (viii).[6]

Because we conclude that the trial court properly charged the jury using the CPL 40.10 definition for "criminal transaction," we now turn to whether the People adduced legally sufficient evidence that the homicides committed by defendant occurred during the "same criminal transaction." Viewed in the light most favorable to the People (see *People v Cunningham*, 2 NY3d 593, 595 n 1 [2004]), we conclude that the evidence of defendant's guilt was clearly sufficient.

By his own admission, defendant armed himself and set about "squash[ing]" the contract on his life by "catch[ing]" Snag, the person whom he held responsible for placing the contract. Before finding Snag, though, defendant happened upon Callie, whom he viewed as Snag's enforcer and therefore a likely candidate to carry out the hit. As part of his effort to "squash" the contract, defendant decided to confront Callie and, as a result of this motivation, he killed Callie.

After killing Callie, defendant raced back to an area less than a block away where he knew he would likely encounter Snag. Although defendant had a 90-minute interval during which to leave, he instead chose to stay, determined to "go on with it." Carrying through on his continuing motivation to "squash" the contract, defendant indeed went "on with it" by reloading his gun and lying in wait for an opportunity to "catch[ ]" Snag. Ultimately, defendant completed exactly what he had set out to

---

6. The dissent seems to read subdivision (1) (a) (xi)'s requirement of "separate" criminal transactions as somehow negating the motivational linkage contemplated by CPL 40.10 (2) (b)'s "single criminal venture" definition. What the dissent overlooks is that acts constituting "separate" homicidal transactions lack, not motivational unity, but rather the contemporaneous conduct required to be the "same criminal transaction." Thus, when different intentional murders are remote enough (due to a lack of the continuous conduct present in this case) to constitute "separate criminal transactions," those murders may nonetheless have been carried out "pursuant to a common scheme or plan."

do: he came down from his rooftop sanctuary, sneaked up on Snag and shot him to death.

The spatial and temporal proximity of defendant's homicidal acts, all of which were fueled by a common motivation, establish that he acted during the "same criminal transaction." Indeed, defendant's various acts were both "so closely related and connected in point of time and circumstance of commission as to constitute a single criminal incident" (CPL 40.10 [2] [a]) and "so closely related in criminal purpose or objective as to constitute elements or integral parts of a single criminal venture" (CPL 40.10 [2] [b]). Put differently, defendant's two homicidal acts were part of a continuous course of conduct sufficient to establish the contemporaneity necessary to constitute "same transaction" first-degree murder.[7] Defendant's remaining claim does not warrant reversal of his judgment of conviction. Accordingly, the order of the Appellate Division should be affirmed.

R.S. SMITH, J. (dissenting). I agree with the majority that the evidence was sufficient to permit a correctly-charged jury to convict defendant of first degree murder, and that the *Sandoval* error of which defendant complains was harmless. I dissent from affirmance of the conviction, however, because I believe the jury was incorrectly charged on the definition of "criminal transaction." The definition used in the charge, while broadening the scope of the subparagraph of the Penal Law involved in this case, shrinks an important part of another subparagraph— the "common scheme or plan" branch of the serial murder statute—to the vanishing point.

Murder in the first degree is defined in Penal Law § 125.27 (1). Section 125.27 (1) (a) lists, in 13 subparagraphs, the aggravating factors that can convert second degree murder to first degree murder. Two of those subparagraphs—subparagraph (viii), the one at issue here, and subparagraph (xi), the serial murder subparagraph—use the term "criminal transaction." Section 125.27 (1) (a) (viii) provides that first degree murder occurs where:

---

7. While it may have been the case here, we are not suggesting that a defendant's acts must establish both parts of the CPL 40.10 (2) definition of "criminal transaction." Indeed, the trial court charged the jury in the disjunctive (*compare People v Mateo*, 2 NY3d 383, 406 [2004], *cert denied* — US —, 124 S Ct 2929 [2004] [rejecting the defendant's claim "that the jury be unanimous on one theory (of first-degree murder liability) or the other"]), as the Criminal Jury Instructions recommend (*see* CJI2d[NY] Penal Law § 125.27 [1] [a] [viii], at 125-2).

"(viii) *as part of the same criminal transaction,* the defendant, with intent to cause serious physical injury to or the death of an additional person or persons, causes the death of an additional person or persons; provided, however, the victim is not a participant in the criminal transaction" (emphasis added).

Section 125.27 (1) (a) (xi) says a killing may be murder in the first degree where:

"(xi) the defendant intentionally caused the death of two or more additional persons within the state *in separate criminal transactions* within a period of twenty-four months when committed in a similar fashion or pursuant to a common scheme or plan" (emphasis added).

Thus subparagraph (viii) applies only where crimes are committed "as part of the same criminal transaction" and subparagraph (xi) only where they are committed "in separate criminal transactions." The two subparagraphs are mutually exclusive, and to expand or contract the definition of "criminal transaction" is a zero sum game: the more cases the definition includes, the more cases will fit within subparagraph (viii) and the fewer within subparagraph (xi). The flaw in the majority opinion, I believe, is that it never addresses this aspect of the statute. It discusses at some length another difference between subparagraphs (viii) and (xi)—that the former uses the present tense and the latter the past. But that discussion is irrelevant to my point, which is that the definition of "criminal transaction" affects each subparagraph in a fundamentally opposite way. For that reason the term should, if possible, be defined in a way that gives meaningful scope to both subparagraphs.

The Legislature has left it to the courts to select a definition. It did not define the term "criminal transaction" for purposes of Penal Law § 125.27; it could have, but did not, adopt the definition contained in CPL 40.10 (2), which is as follows:

" 'Criminal transaction' means conduct which establishes at least one offense, and which is comprised of two or more or a group of acts either (a) so closely related and connected in point of time and circumstance of commission as to constitute a single criminal incident, or (b) so closely related in criminal purpose or objective as to constitute elements or integral parts of a single criminal venture."

Like the majority, I do not read into the Legislature's failure to adopt the CPL definition an implied rejection of it. I agree that we are free to adopt that definition for purposes of Penal Law § 125.27 if we think it the best available. But we are not compelled to adopt it, and in my view it is not the best available. I would adopt instead only subsection (a) of CPL 40.10 (2), and I would define "criminal transaction" to mean "conduct which establishes at least one offense, and which is comprised of two or more or a group of acts so closely related and connected in point of time and circumstance of commission as to constitute a single criminal incident."

If this definition is adopted, Penal Law § 125.27 (1) (a) (viii) will continue to have substantial content. Anyone who kills two people where the killings are sufficiently close in time and circumstance of commission will be guilty of first degree murder under subparagraph (viii). This definition would clearly permit the present defendant to be convicted of first degree murder. His two killings were only about an hour and a half apart and were linked by a continuous chain of circumstances: a jury could well have found that they were parts of "a single criminal incident."

But it is a mistake, in my view, to include the second half of the CPL definition—acts "so closely related in criminal purpose or objective as to constitute elements or integral parts of a single criminal venture"—when defining "criminal transaction" for Penal Law § 125.27 purposes. When this part of the definition is applied to Penal Law § 125.27 (1) (a) (xi) it produces a result that is strange at best. Subparagraph (xi) applies to crimes that occur "in separate criminal transactions . . . pursuant to a common scheme or plan." Under the definition the majority adopts, this must mean crimes that are *not* "so closely related in criminal purpose or objective as to constitute elements or integral parts of a single criminal venture" and yet are part of "a common scheme or plan." The language seems almost perfectly self-contradictory; I cannot think of a single case to which it would apply, and neither the People's brief in this case nor the majority opinion offers an example. Thus the majority's definition effectively nullifies the "common scheme or plan" branch of Penal Law § 125.27 (1) (a) (xi). Subparagraph (xi) would have meaning only as applied to crimes committed in "separate criminal transactions . . . in a similar fashion." When the Legislature added the words "or pursuant to a common scheme or plan" it was apparently wasting its breath.

Accordingly, I would reverse the defendant's conviction on the ground that the trial court erroneously adopted the definition of "criminal transaction" contained in CPL 40.10 (2) (b).

Judges G.B. SMITH, ROSENBLATT and GRAFFEO concur with Judge READ; Judge R.S. SMITH dissents and votes to reverse in a separate opinion in which Chief Judge KAYE and Judge CIPARICK concur.

Order affirmed.