*Supreme Court, Appellate Division*
*Third Judicial Department*

Decided and Entered:  November 5, 2015                    105989
_____

THE PEOPLE OF THE STATE OF
    NEW YORK,
                        Respondent,

         v                                   MEMORANDUM AND ORDER

IVAN RAMOS, Also Known as
    BIG MAN,
                        Appellant.
_____

Calendar Date:   September 14, 2015

Before:   Egan Jr., J.P., Rose, Devine and Clark, JJ.

                    _____

        Joseph Nalli, Fort Plain, for appellant.

        James E. Conboy, District Attorney, Fonda (Sarah J.
Leszczynski of counsel), for respondent.

                    _____

Clark, J.

        Appeal from a judgment of the County Court of Montgomery
County (Catena, J.), rendered March 20, 2013, upon a verdict
convicting defendant of the crimes of murder in the first degree
(two counts) and criminal possession of a weapon in the third
degree.

        Following the brutal killing of William McDermott and
Cheryl Goss Faboskay at McDermott's apartment in Montgomery
County, defendant was indicted on two counts each for the crimes
of murder in the first degree and criminal possession of a weapon
in the third degree.  A jury thereafter found defendant guilty of
both counts of murder and one count of criminal possession of a
weapon and he was sentenced, as a second felony offender, to an

aggregate term of life in prison without the possibility of parole.  Defendant now appeals and we affirm.

As an initial matter, defendant's claim that his convictions were not supported by legally sufficient evidence is unpreserved, as his motion to dismiss at the close of the People's case was not based on the grounds that he has now raised on appeal (see People v Hawkins, 11 NY3d 484, 492 [2008]; People v Hook, 80 AD3d 881, 882 [2011], lv denied 17 NY3d 806 [2011]). In any event, because defendant also contends that his convictions are against the weight of the evidence, we remain obligated to nonetheless conduct "an evaluation of whether all elements of the charged crime[s] were proven beyond a reasonable doubt at trial" (People v Robinson, 123 AD3d 1224, 1225 [2014], lvs denied 25 NY3d 992, 993 [2015] [internal quotation marks and citations omitted]; see People v Danielson, 9 NY3d 342, 348-349 [2007]).  In determining whether the verdict is against the weight of the evidence, we undertake to weigh the probative force of conflicting testimony and the strength of conflicting inferences (see People v Bleakley, 69 NY2d 490, 495 [1987]; People v Salce, 124 AD3d 923, 925-926 [2015], lv denied 25 NY3d 1207 [2015]).

For defendant to be found guilty of criminal possession of a weapon in the third degree, the People were required to prove that defendant possessed a "dangerous or deadly instrument or weapon with intent to use the same unlawfully against another" (Penal Law § 265.01 [2]) and that he had previously been convicted of a crime (see Penal Law § 265.02 [1]).  Next, as to the charges of murder in the first degree, the People were required to prove that, "[w]ith intent to cause the death of another person, [defendant] cause[d] the death of such person or of a third person . . . and[,] as part of the same criminal transaction, . . . defendant, with intent to cause serious physical injury to or the death of an additional person or persons, cause[d] the death of an additional person or persons; provided, however, the victim is not a participant in the criminal transaction" (Penal Law § 125.27 [1] [a] [viii]). "Criminal transaction," in turn, is defined as "conduct which establishes at least one offense, and which is comprised of two or more or a group of acts either (a) so closely related and

connected in point of time and circumstance of commission as to constitute a single criminal incident, or (b) so closely related in criminal purpose or objective as to constitute elements or integral parts of a single criminal venture" (CPL 40.10 [2]; see People v Duggins, 3 NY3d 522, 527 [2004]).

Here, several individuals — including Miguel Quinones, Edward Fisher, Craig McCormick and Deborah Baker — testified that they saw defendant at McDermott's apartment on the evening of March 1, 2012. Quinones, Fisher and McCormick each testified that defendant did not have any cuts or scratches on his face at that time, and Baker testified that defendant was wearing a camouflage coat, T-shirt and gray sweatpants. Explaining that he was expecting a visit from a woman, McDermott asked Fisher and defendant to leave his apartment at approximately 2:00 a.m. on March 2, 2012.

Shortly thereafter, at approximately 3:00 a.m., defendant arrived at the home of Terry Dallas Reedy, where he asked to use the telephone to call McDermott. Reedy allowed him to do so and, after the phone call ended, defendant left Reedy's home. About 30 minutes later, when he was already in bed, Reedy heard McCormick — who was also at Reedy's house — open the door. When Reedy asked McCormick where he was going, McCormick stated that he was going home. Reedy testified that he then fell asleep, but was later awoken by someone banging on his door. Upon answering the door, Reedy found McCormick, who he described as white as a ghost, screaming "they're dead" repeatedly.

McCormick testified that, after leaving Reedy's home, he went back to McDermott's apartment and, upon arriving, noticed a lot of blood in the hallway leading to McDermott's front door. McCormick then tried to gain access to the apartment and, finding the door locked, went around to the back door where he noticed one set of footprints in the snow leading toward the street. McCormick averred that the back door was open, so he entered the apartment and saw large amounts of blood and McDermott and a woman laying on the floor. McCormick testified that he then locked the back door and used a pot holder to open the front door in an effort to avoid touching the blood. He then went through the alleyway next to the apartment to see if anyone was there

and, finding no one, proceeded back to Reedy's house, dropping the pot holder in the street on his way.

Richard Haver, who lived in the apartment directly across the hall from McDermott's apartment, testified that he stopped home from work at approximately 2:00 a.m. and the building was quiet at that time. Haver stated that he went back to work a short time later and that, when he returned home at the end of his shift at approximately 5:25 a.m., he saw blood on the walls and floor of the hallway and heard the television playing from inside McDermott's apartment. Haver then called the police.

Elvira Ramos, defendant's sister, testified that she saw defendant on March 1, 2012 and that he was wearing a camouflage jacket when he arrived at her home at around 5:00 a.m. on the morning of March 2, 2012. Mario Rios, who was also present at Ramos' home on the morning in question, testified that he heard defendant using the bathroom and that, after defendant left, he saw water and blood in the bathroom, which he cleaned up. Both Ramos and defendant's wife testified that defendant had scratches on his face, but that they were a week old and that they were caused by his wife hitting him with a lamp.

Israel Toro, an investigator with the State Police, testified that he interviewed defendant and that defendant stated that he left his residence at approximately 5:00 p.m. on March 1, 2012 and arrived at McDermott's apartment around 9:00 p.m. Defendant told Toro that he left McDermott's apartment at approximately 2:30 a.m. and went to Reedy's house, where he called McDermott. Toro testified that defendant stated that he then left Reedy's house and went home, stopping to talk with two people on the way. Toro stated that defendant had indicated that he was wearing a black polo, boots, a jacket and blue jeans and that he had previously sold his camouflage jacket. Defendant later modified his story, telling Toro that he had only sold the insert to the camouflage jacket after leaving McDermott's apartment on the morning of March 2, 2012. Toro stated that he asked defendant if he knew why he was being interviewed and defendant replied that he did not. However, when Toro told defendant that it was in relation to a homicide investigation, Toro stated that defendant "became very emotional, teared up, and

started talking about [McDermott]," despite the fact that Toro had not informed defendant of the victims' names. Defendant also told Toro that he kept personal items at McDermott's apartment, including several knives. John Thomas, a detective with the Amsterdam Police Department, explained that surveillance videos of the area where these events took place generally corroborated McCormick's testimony.

Michael Sikirica, a forensic pathologist who performed autopsies on the victims, testified that both victims were stabbed several times and that each had several defensive wounds. Sikirica opined that McDermott's death was caused by asphyxia and hemorrhaging and that Faboskay's death was caused by "multiple stab and incise wounds with perforations of the lungs and transection of the left subclavian vein." A forensic scientist testified that a sneaker recovered from defendant's home tested positive for blood. However, another forensic scientist testified that the blood did not contain the DNA of either of the victims. Defendant's DNA was found on several items that were in McDermott's apartment. Additionally, two forensic technicians with the State Police testified that defendant's bloody palm print was found in McDermott's apartment and that a shoe print matching the shoe recovered from defendant's home was found on Faboskay's coat. Finally, evidence was submitted demonstrating that defendant had previously been convicted of a crime.

In our view, the evidence supports the jury's determination that defendant is guilty of both counts of murder in the first degree, as well as criminal possession of a weapon in the third degree. According deference to the jury's apparent acceptance of McCormick's testimony and the forensic evidence, we cannot agree that the verdict was against the weight of the evidence.

Turning to defendant's challenge to County Court's Sandoval ruling, we note that the court permitted the People to inquire regarding only five of defendant's prior convictions and further limited the scope of inquiry by permitting inquiry into only the date and the number of felony convictions with respect to his 2012 burglary convictions. Inasmuch as the commission of crimes involving dishonesty or untrustworthiness is particularly probative of credibility and the court properly weighed the

probative value of the prior convictions against the risk of
prejudice to defendant, we cannot say that the Sandoval
compromise constituted an abuse of discretion (see People v
Williams, 56 NY2d 236, 237-239 [1982]; People v Sandoval, 34 NY2d
371, 373-374, 376-377 [1974]; People v Fomby, 101 AD3d 1355, 1357
[2012]; People v Lemke, 58 AD3d 1078, 1078-1079 [2009]).

     Nor can we agree that defendant's sentence is harsh or
excessive.  A sentence that falls within the permissible
statutory range will not be disturbed unless it can be shown
"'that the sentencing court abused its discretion or
extraordinary circumstances exist warranting a modification'"
(People v Lancaster, 121 AD3d 1301, 1304 [2014], lv denied 24
NY3d 1121 [2015], quoting People v Cruz, 53 AD3d 986, 986
[2008]).  Here, defendant was sentenced to an aggregate term of
life in prison without the possibility of parole, which sentence
he concedes is within permissible statutory range (see Penal Law
§§ 70.00 [5]; 125.27, 265.02).  The record before us demonstrates
that defendant acted with a shocking and profound level of
violence when he took the lives of McDermott and Faboskay.
Sikirica testified that it likely took defendant 15 to 30 minutes
to inflict the injuries that ultimately resulted in the victims'
deaths.  Further, crime scene evidence and a recording of a 911
call[1] revealed that, when McDermott managed to escape the
apartment, defendant hunted him down and dragged him back inside
to his death.  In light of this extreme violence and defendant's
lack of remorse, defendant's sentence does not constitute an
abuse of County Court's discretion and there are no extraordinary
circumstances warranting a modification thereof (see People v
Shoemaker, 119 AD3d 1073, 1077 [2014], lv denied 25 NY3d 992
[2015]; People v Callicut, 101 AD3d 1256, 1264-1265 [2012], lvs
denied 20 NY3d 1096, 1097 [2013]; People v Muller, 72 AD3d 1329,
1336 [2010], lv denied 15 NY3d 776 [2010]).

     Finally, defendant contends that he was denied the
effective assistance of counsel – a claim that is premised, in

_____

     [1]  McDermott was able to call 911 from his cellular
telephone but, due to his injuries, was unable to speak to the
operator.

large measure, upon counsel's failure to request a circumstantial evidence charge and to discuss in his closing statement unidentified DNA found at the crime scene.  To establish a claim of ineffective assistance of counsel, defendant "is required to demonstrate that he was not provided meaningful representation and that there is an absence of strategic or other legitimate explanations for counsel's allegedly deficient conduct" (People v McRobbie, 97 AD3d 970, 972 [2012], lv denied 20 NY3d 934 [2012] [internal quotation marks and citations omitted]; see People v Caban, 5 NY3d 143, 152 [2005]).  Based upon our review of the record as a whole, we are satisfied that defendant received meaningful representation.  Among other things, trial counsel made appropriate pretrial motions, cross-examined the People's witnesses, made appropriate objections and gave cogent opening and closing statements.  Inasmuch as defendant failed to demonstrate a lack of strategic or other legitimate explanations for counsel's alleged insufficiencies, we cannot agree that he was deprived of the effective assistance of counsel.

Egan Jr., J.P., Rose and Devine, JJ., concur.


ORDERED that the judgment is affirmed.




ENTER:

Robert D. Mayberger
Clerk of the Court